# CLARK v. UNITED STATES

No. 531.   Argued February 6, 7, 1933.—Decided March 13, 1933

2

Mr. *Sigurd Ueland* for petitioner.

4

*Mr. Whitney North Seymour,* with whom *Solicitor General Thacher, Assistant Attorney General Dodds,* and *Messrs. W. Marvin Smith* and *Wm. H. Riley, Jr.,* were on the brief, for the United States.

Mr. Justice Cardozo delivered the opinion of the Court.

The petitioner, Genevieve A. Clark, has been adjudged guilty of a criminal contempt in that with intent to obstruct justice she gave answers knowingly misleading and others knowingly false in response to questions affecting her qualifications as a juror. 1 F.Supp. 747.

The conviction by the District Court was affirmed by the Circuit Court of Appeals for the Eighth Circuit, the proceeding being remanded, however, to correct an error in the sentence. 61 F. (2d) 695. A writ of certiorari brings the case here.

In September, 1931, there came on for trial in the United States District Court for the District of Minnesota an indictment which had been returned against William B. Foshay and others charging them with the use of the mails in furtherance of a scheme to defraud. The petitioner was one of the panel of jurors summoned to attend. She did not know when the summons came to her for what case she had been called, and telephoned

a sister, Mrs. Brown, that she would like to be excused. She was advised by her sister, who had made inquiry of the Clerk of the Court, that excuses, if there were any, would have to be presented to the judge. At the same time she was informed that the trial for which she had been summoned was the Foshay trial, and that she would probably not be accepted as a juror since she had been employed by the Foshay Company, a corporation with which the indicted men had been connected as officers.

On the day appointed for the trial the petitioner, in company with her husband, reported at the court room. The District Judge examined the members of the panel as to their qualifications for service. While the examination was going on, the petitioner stated to several women on the panel that she wished to serve on the jury, that for this she had a special reason, and that she was afraid her former employment by the Foshay Company would disqualify her; that she had worked for the company as a stenographer and typist for about two weeks in the summer of 1929, but did not know or come in contact with any of the defendants personally.

Her service as stenographer and typist was not the only tie of friendliness that linked her to the Foshay firm. There were other contacts or relations that are not without significance, though less direct and personal. Until her marriage in 1922, she had been employed with the title of assistant cashier in a bank at St. Paul, of which Mr. Clark was then the president. Foshay in those years was a customer of the bank as depositor and borrower. Mr. Clark resigned as president in 1925, but his business relations with Foshay continued in the years that followed. Letters that passed between them are printed in the record. The tone is cordial and almost intimate. True, there is nothing to show that the friendly relations had spread to the petitioner. She denies that she had any

acquaintance with Foshay or his associates, and the District Court by its findings has accepted her denial. It is next to impossible, however, that her husband, who was with her in the court room, had refrained from telling her of his own friendship for one of the prisoners at the bar. The petitioner, upon being called to the jury box, was questioned under oath by the judge presiding at the trial. She was asked whether she had ever been in any business of any kind. She answered, " I have been a stenographer before my marriage, yes." She was asked in what kind of business she had worked. She answered, " Well, I did some banking and some real estate and insurance, and I was with an automobile concern, with a Nash agency." Finally she was asked whether she felt that her mind was free from bias, and whether if accepted as a juror she would be able and willing to base her verdict on the evidence and the law as given to her by the court. To those inquiries she answered that her mind was clear of bias, and that the law and the evidence would govern her in arriving at a verdict.

The petitioner after thus testifying became a member of the jury, which was thereupon complete. The trial which followed lasted eight weeks. Two officers, a man and a woman, were in charge of the jury from the beginning to the end. During the first week of the trial, the petitioner made the remark to several of her fellow jurors that she regarded Mr. Foshay as a victim of circumstances, that he had gone to New York in the fall of 1929 to borrow $18,000,000, but that, because of the stock market crash, had come back without a dollar. When asked by a juror where she had procured that information, which was not supported by the evidence, she said that it was from a newspaper which she had read before the trial. Later on she gave expression to dissatisfaction with the Government because of the way the soldiers were treated after the war.

During the deliberations of the jury, after the case was finally submitted, she announced that since the prosecuting attorney had been unable to convince her of the guilt of the accused, the other jurors could hardly be expected to do so. At times she placed her hands over her ears when other jurors tried to reason with her, and argument became useless because she was unwilling to reply. She said of a witness for the Government that he had given perjured evidence in the South in an attempt to convict an innocent man. This information had come to her in the course of a conversation with her husband who had seen her at her hotel, in the presence of a bailiff, while the trial was under way. After being kept together for a week, the jury was discharged because unable to agree. The votes of eleven were for conviction. The single vote for acquittal was cast by the petitioner.

On November 4, 1931, the Government filed an information in support of a rule to show cause why the petitioner should not be punished for a criminal contempt. The information charges that her answers upon the *voir dire* examination were wilfully and corruptly false, and that the effect of her misconduct had been to hinder and obstruct the trial. In response to the rule to show cause the defendant filed an answer denying the misconduct, and alleging that her vote for acquittal had been dictated by her conscience. There was a full and patient hearing by a District Court of two judges. The court found the facts as they have been stated in this opinion. It drew from them the conclusion that the juror had obstructed the administration of justice, when examined on her *voir dire,* by " deliberately and intentionally " concealing the fact that she had been employed during the summer of 1929 by the Foshay Company. It drew the conclusion also that she had obstructed the administration of justice by stating falsely that she was free from bias and that her verdict would be based only upon the evidence as

introduced and the law as given by the court. For the contempt thus adjudged there was a sentence of imprisonment and fine.

■ Concealment or misstatement by a juror upon a *voir dire* examination is punishable as a contempt if its tendency and design are to obstruct the processes of justice.

There_ was concealment by the petitioner, and that wilful and deliberate. She had been asked to state the kinds of work that she had been doing in other years. She counted off a few, and checked herself at the very point where the count, if completed, would be likely to bar her from the box. There is no room for the excuse of oversight or negligence. She had been warned that disclosure would lead to challenge and rejection. With her mind full of the warning she told the part truth that was useless, and held back the other part that had significance and value. Whether this was perjury or false swearing, there is no occasion to inquire. It was a deliberate endeavor to thwart the process of inquiry, and to turn a trial into a futile form.

Added to concealment there was positive misstatement. The petitioner stated to the court that her mind was free from bias. The evidence is persuasive that it was hostile to the Government. Bias is to be gathered from the disingenuous concealment which kept her in the box. She was intruding into a relation for which she believed herself ineligible, and intruding with a motive. The only plausible explanation is a preconceived endeavor to uphold the cause of the defendants and save them from their doom. Bias, thus revealed at the beginning, is confirmed by everything that followed. While the trial was still in progress, she argued with her fellow jurors that Foshay was a hapless victim of circumstances too strong for him, and went outside the evidence, quoting statements in a newspaper to win them to her view. After the

trial was over and deliberations had begun, she waved aside all argument and closed her ears to the debate. She had closed her mind to it before.

"An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is . . . the characteristic upon which the power to punish for contempt must rest." White, C. J., in *Ex parte Hudgings*, 249 U.S. 378, 383. The petitioner is not condemned for concealment, though concealment has been proved. She is not condemned for false swearing though false swearing has been proved. She is condemned for that she made use of false swearing and concealment as the means whereby to accomplish her acceptance as a juror, and under cover of that relation to obstruct the course of justice. There is a distinction not to be ignored between deceit by a witness and deceit by a talesman. A talesman when accepted as a juror becomes a part or member of the court. *In re Savin,* 131 U.S. 267; *United States* v. *Dachis,* 36 F. (2d) 601. The judge who examines on the *voir dire* is engaged in the process of organizing the court. If the answers to the questions are wilfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham. What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. If a kinsman of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different. The doom of mere sterility was on the trial from the beginning.

The books propound the question whether perjury is contempt, and answer it with nice distinctions. Perjury by a witness has been thought to be not enough where the obstruction to judicial power is only that inherent in the wrong of testifying falsely. *Ex parte Hudgings, supra.*

For offenses of that order the remedy by indictment is appropriate and adequate. On the other hand, obstruction to judicial power will not lose the quality of contempt though one of its aggravations be the commission of perjury. Cf. *In re Ulmer*, 208 Fed. 461; *United States* v. *Appel*, 211 Fed. 495; *United States* v. *Karns*, 27 F. (2d) 453; *United States* v. *Dachis*, 36 F. (2d) 601; *Lang* v. *United States*, 55 F. (2d) 922; 286 U.S. 523; *United States* v. *McGovern*, 60 F. (2d) 880. We must give heed to all the circumstances, and of these not the least important is the relation to the court of the one charged as a contemnor. Deceit by an attorney may be punished as a contempt if the deceit is an abuse of the functions of his office (*Bowles* v. *United States*, 50 F. (2d) 848, 851; *United States* v. *Ford*, 9 F. (2d) 990), and that apart from its punishable quality if it had been the act of some one else. A talesman, sworn as a juror, becomes, like an attorney, an officer of the court, and must submit to like restraints. The petitioner blurs the picture when she splits her misconduct into parts, as if each were a separate wrong to be separately punished. What is punished is misconceived unless conceived of as a unit, the abuse of an official relation by concealment and deceit. Some of her acts or none of them may be punishable as crimes. The result is all one as to her responsibility here and now. She has trifled with the court of which she was a part, and made its processes a mockery. This is contempt, whatever it may be besides. *Sinclair* v. *United States*, 279 U.S. 749; *In re Savin*, 131 U.S. 267.

■ The admission of testimony as to the conduct of the petitioner during the deliberations of the jury was not a denial or impairment of any lawful privilege.

The books suggest a doctrine that the arguments and votes of jurors, the *media concludendi*, are secrets, protected from disclosure unless the privilege is waived. What is said upon the subject in the adjudicated cases, is

dictum rather than decision. See *Woodward* v. *Leavitt*, 107 Mass. 453, 460; cf. *Matter of Cochran*, 237 N.Y. 336, 340; 143 N.E. 212; *People ex rel. Nunns* v. *County Court*, 188 App. Div. (N.Y.) 424, 430; 176 N.Y.S. 858. Even so, the dicta are significant because they bear with them the implications of an immemorial tradition. The doctrine is developed, and the privilege broadly stated, in the writings of a learned author. Wigmore, Evidence, (2d ed.) vol. 5, § 2346. It has recognition to some extent by other authors of repute (Hughes, Evidence, p. 301; Jones, Commentaries on Evidence, 2d ed., § 2212; Chamberlayne, Evidence, vol. 5, § 3707), but in a way that has confused it with something very different, the competency of witnesses to testify in impeachment of a verdict. What concerns us at the moment is the privilege alone. There will be need to recur later to the rule as to impeachment. For the origin of the privilege we are referred to ancient usage, and for its defense to public policy. Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. The force of these considerations is not to be gainsaid. But the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process. The function is the more essential where a privilege has its origin in inveterate but vague tradition and where no attempt has been made either in treatise or in decisions to chart its limits with precision.

Assuming that there is a privilege which protects from impertinent exposure the arguments and ballots of a juror

while considering his verdict, we think the privilege does not apply where the relation giving birth to it has been fraudulently begun or fraudulently continued. Other exceptions may have to be made in other situations not brought before us now. It is sufficient to mark the one that is decisive of the case at hand. The privilege takes as its postulate a genuine relation, honestly created and honestly maintained. If that condition is not satisfied, if the relation is merely a sham and a pretense, the juror may not invoke a relation dishonestly assumed as a cover and cloak for the concealment of the truth. In saying this we do not mean that a mere charge of wrongdoing will avail without more to put the privilege to flight. There must be a showing of a *prima facie* case sufficient to satisfy the judge that the light should be let in.* Upon that showing being made, the debates and ballots in the jury room are admissible as corroborative evidence, supplementing and confirming the case that would exist without them. Let us assume for illustration a prosecution for bribery. Let us assume that there is evidence, direct or circumstantial, that money has been paid to a juror in consideration of his vote. The argument for the petitioner, if accepted, would bring us to a holding that the case for the People must go to the triers of the facts without proof that the vote has been responsive to the bribe. This is paying too high a price for the assurance to a juror of serenity of mind. *People ex rel. Nunns* v. *County Court, supra.*

---

* As to the function of the judge in the decision of such preliminary questions see: Maguire and Epstein, Preliminary Questions of Fact in Determining the Admissibility of Evidence, 40 Harvard L.Rev. 392, 397, 403; Morgan, Functions of Judge and Jury, 43 Harvard L. Rev. 165; Maguire and Epstein, Rules of Evidence in Preliminary Controversies as to Admissibility, 36 Yale L.J. 1101, and the cases there collected.

We turn to the precedents in the search for an analogy, and the search is not in vain. There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told. There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. See, e.g., *Reynell* v. *Sprye,* 10 Beav. 51, 54, 11 Beav. 618; *In re Postlewaite,* 35 Ch.D. 722, 724; cf. *Regina* v. *Bollivant* [1900] 2 Q.B.D. 163, [1901] A.C. 196. But this conception of the privilege is without support in later rulings. "It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud." *O'Rourke* v. *Darbishire,* [1920] A.C. 581, 604. To drive the privilege away, there must be " something to give colour to the charge; " there must be " *prima facie* evidence that it has some foundation in fact." *O'Rourke* v. *Darbishire, loc. cit., supra;* also pp. 614, 622, 631, 633. When that evidence is supplied, the seal of secrecy is broken. See also: *Regina* v. *Cox,* [1884] 14 Q.B.D. 153, 157, 161, 175; cf. *Bujac* v. *Wilson,* 27 N.Mex. 112; 196 Pac. 513; *In re Niday,* 15 Idaho 559; 98 Pac. 845. The judgment of the House of Lords in *O'Rourke* v. *Darbishire* has given to the whole subject a definitive exposition. Nor does the loss of the privilege depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out. *Regina* v. *Cox, supra; Matthews* v. *Hoagland,* 48 N.J.Eq. 455, 469; 21 Atl. 1054; *State* v. *Faulkner,* 175 Mo. 546, 593; 75 S.W. 116; *Standard Fire Ins. Co.* v. *Smithhard,* 183 Ky. 679, 684; 211 S.W. 441; *State* v. *Kidd,* 89 Iowa 54; 56 N.W. 263;

cf. *Bank of Utica* v. *Mersereau,* 3 Barb. Ch. 528, 598; *Coveney* v. *Tannahill,* 1 Hill (N.Y.) 33, 41.

With the aid of this analogy, we recur to the social policies competing for supremacy. A privilege surviving until the relation is abused and vanishing when abuse is shown to the satisfaction of the judge has been found to be a workable technique for the protection of the confidences of client and attorney. Is there sufficient reason to believe that it will be found to be inadequate for the protection of a juror? No doubt the need is weighty that conduct in the jury room shall be untrammeled by the fear of embarrassing publicity. The need is no less weighty that it shall be pure and undefiled. A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence or malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor. The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice. It must yield to the overmastering need, so vital in our polity, of preserving trial by jury in its purity against the inroads of corruption. Cf. *Attorney-General* v. *Pelletier,* 240 Mass. 264; 134 N.E. 407; *People ex rel. Hirschberg* v. *Board of Supervisors,* 251 N.Y. 156, 170; 167 N.E. 204; *State* v. *Campbell,* 73 Kan. 688; 85 Pac. 784.

Nothing in our decision impairs the authority of *Bushell's* case, Vaughan 135, 1670, with its historic vindication of the privilege of jurors to return a verdict freely according to their conscience. There had been a trial of Penn and Mead on a charge of taking part in an unlawful assembly. The jurors found a verdict of acquittal, though in so doing they refused to follow the instructions of the

court. For this they were fined and imprisoned, but were discharged on *habeas corpus,* Vaughan, C. J. pronouncing " that memorable opinion which soon ended the fining of jurors for their verdicts, and vindicated their character as judges of fact." Thayer, Preliminary Treatise on Evidence at the Common Law, p. 167. *Bushell's* case was born of the fear of the Star Chamber and of the tyranny of the Stuarts. Plucknett, Concise History of the Common Law, p. 114. It stands for a great principle, which is not to be whittled down or sacrificed. On the other hand, it is not to be strained and distorted into fanciful extensions. There is a peril of corruption in these days which is surely no less than the peril of coercion. The true significance of *Bushell's* case is brought out with clearness in declaratory statutes. By one of these, a statute of New York, " No juror shall be questioned [for any verdict rendered by him], or be subject to any action, civil or criminal, except to indictment for corrupt conduct in rendering such verdict, in the cases prescribed by law." R.S. of N.Y., Part 3, c. 7, Title 4, § 69; Civil Rights Law, § 14. The Revisers tell us in their notes that the statute, though new in form, is declaratory of an ancient principle (R.S., 2d ed., vol. 3, p. 741), and so we may assume it is. *Matter of Cochran,* 237 N.Y. 336, 340; 143 N.E. 212; cf. *People ex rel. Nunns* v. *County Court, supra* at p. 448. It would give no help to the petitioner though it were enacted for the federal courts. She has not been held to answer for any verdict that she has rendered, nor for anything said or done in considering her verdict. *Matter of Cochran, supra.* She has been held to answer for the deceit whereby she made herself a juror, and was thereby placed in a position to vote upon the case at all. What was said and done in the jury room is not the gist of her wrongdoing. What was said and done in the jury room is no more than confirmatory evidence of her state of mind

before. One could urge with as much reason that she would be subjected to coercion if she had been indicted and tried for bribery and the same evidence had been accepted in support of the indictment.

Nor is there anything in our decision at variance with the rule, which is not without exceptions (*Mattox* v. *United States,* 146 U.S. 140, 148; cf. Wigmore, Evidence, vol. 5, §§ 2353, 2354; *Woodward* v. *Leavitt,* 107 Mass. 453; *Hyman* v. *Eames,* 41 Fed. 676; *Fuller* v. *Fletcher,* 44 Fed. 34, 39), that the testimony of a juror is not admissible for the impeachment of his verdict. *McDonald* v. *Pless,* 238 U.S. 264. Here there was no verdict, and hence none to be impeached. But in truth the rule against impeachment is wholly unrelated to the problem now before us, the limits of the privilege to maintain a confidence inviolate. Wigmore, *supra,* § 2346. Impeachment may be forbidden though the jurors waive their privilege, and combine with the defeated litigant to make the verdict null. Privilege may be asserted though there is nothing to impeach.

In the record now before us the evidence of guilt is ample, without the happenings in the jury room, to break down the claim of privilege, and thus let in the light. There is the evidence of the concealment of the petitioner's employment with all its sinister implications. There is the evidence of her arguments with the jurors while the trial was going on. There is even the evidence of her vote, for the fact that she had voted for acquittal had been stated in her answer, and to the extent of the voluntary disclosure the privilege had been waived. Indeed what happened in the jury room added so little to the case that the error, if there had been any, in permitting it to be proved, would have to be regarded as unsubstantial and without effect on the result. No one can read the findings of the triers of the facts and hesitate in concluding that even with this evidence omitted

there would have been an adjudication of contempt. In considering with all this fulness the merits of the ruling, we have been moved by the desire to build securely for the future.

■ The oath of a contemnor is no longer a bar to a prosecution for contempt.

Little was left of that defense after the decision of this court in *United States* v. *Shipp,* 203 U.S. 563, 574. Since then there has been no purgation by oath where an overt act of defiance is the gist of the offense. The point was reserved whether sworn disavowal would retain its ancient force " if the sole question were the intent of an ambiguous act."

The time has come, we think, to renounce the doctrine altogether and stamp out its dying embers. It has ceased to be a defense in England since 1796. *Matter of Crossley,* 6 T.R. 701. It has been rejected generally in the States. *Dale* v. *State,* 198 Ind. 110; 150 N.E. 781; *State* v. *District Court,* 92 Mont. 94; 10 P. (2d) 586; *In re Singer,* 105 N.J. Eq. 220; 147 Atl. 328; *State* v. *Keller,* 36 N.M. 81; 8 P. (2d) 786; *Boorde* v. *Commonwealth,* 134 Va. 625; 114 S.E. 731; *Huntington* v. *McMahon,* 48 Conn. 174, 200, 201; *State* v. *Matthews,* 37 N.H. 450, 455; *Bates's Case,* 55 N.H. 325, 327; *State* v. *Harper's Ferry Bridge Co.,* 16 W.Va. 864, 873; cf. *Carson* v. *Ennis,* 146 Ga. 726; 92 S.E. 221; *Matter of Snyder,* 103 N.Y. 178, 181; 8 N.E. 479; note 9 L.R.A. (N.S.) 1119; Curtis, 41 Harvard L. Rev. 51, 65. It has even lost, since the decision in the *Shipp* case, the title to respect that comes of a long historical succession. It has taken its place with ordeal and wager of law and trial by battle among the dimly remembered curios of outworn modes of trial. Thayer, *op. cit., supra,* p. 8, *et seq.*

■ There was no denial to the petitioner of a fair notice of hearing, nor any variance of substance between the information and the findings.

20

We have considered the arguments to the contrary, and find them without merit.

. The judgment of the Circuit Court of Appeals is accordingly                                                    *Affirmed.*

