## UNITED STATES v. FREEDLAND.
### Cr. No. 8186.

United States District Court
D. North Dakota, Southeastern Division.

Feb. 27, 1953.

Harry Lashkowitz, Asst. U. S. Atty., of Fargo, N. D., for petitioner.

J. F. X. Conmy, (of Burnett, Bergesen, Haakenstad & Conmy), and George E. Duis, of Fargo, N. D., for respondent.

VOGEL, District Judge.

This is a proceeding by the United States based upon a petition asking this Court for an order to show cause why the respondent should not be found guilty of criminal contempt. The order to show cause was duly issued and the case was tried to the Court.

The actions of the respondent which the petitioner alleges amounted to criminal contempt arose out of the respondent's answers to questions put to him by the Court on the *voir dire* examination prior to his service as foreman of the jury in the case of United States v. Waldie, a criminal matter in which the defendant was charged with having attempted to defraud the Government and evade payment of a large portion of his income tax. In that case the defendant was found not guilty. The Court desires once and for all to lay the ghost of the Waldie case which has hovered over this entire proceeding.

It has been charged, by inference, that this contempt case was brought because prosecuting officials and other representatives of the Government were disgruntled at the outcome of the Waldie case and chose this means of punishing one or more

of the jurors and of intimidating future jurors from holding against the Government. Such charge is, in the opinion of the Court, entirely baseless and unjustified. Furthermore, if anyone could be so foolish as to believe future jurors could be so intimidated or coerced, such person knows not the temper or timber of the jurors in this District.

This is not nor could it be a retrial of the Waldie case. That is a closed and past incident. The defendant was found not guilty by the jury and that finding cannot and will not be disturbed. How the respondent voted in connection with that case is of complete immateriality. What we are trying to determine here is whether or not the respondent was guilty of willfully giving false and/or misleading answers to the Court in connection with questions asked him pertaining to his qualifications to serve as a juror in the Waldie case.

■ Under the rules of this Court, the Judge examines all jurors on the *voir dire* pertaining to their qualifications to serve on the particular case to be tried. Subsequent to the Judge's examination, counsel are asked and given an opportunity to present any additional questions which the Judge might have overlooked. The answers to questions put by the Court necessarily form the basis for the Court's excusing a juror on its own motion or challenges for cause by the parties and the exercise of peremptory challenges by each side. Necessarily, it is expected and required that jurors in their answers shall be completely truthful and that they shall disclose, upon a general question, any matters which might tend to disqualify them from sitting on the case for any reason. It therefore becomes imperative that the answers be truthful and complete. False or misleading answers may result in the seating of a juror who might have been discharged by the Court, challenged for cause by counsel or stricken through the exercise of peremptory challenge. The seating of such a juror could and probably would result in a miscarriage of justice and therefore courts and attorneys, who are officials of the court, are ever mindful of the importance of jurors' answers to questions regarding their qualifications.

The petition herein, which, in effect, takes the place of an information or an indictment, specifically charges:

1. That the respondent's answers to the following questions were willfully corrupt, false and contrary to his oath:

"The Court: Have you ever had any difficulty in the past or argument about or controversy over your State or Federal income tax returns? A. No, just by a mistake, that's all.

"The Court: Just by a mistake? A. Yes."

2. That the respondent willfully gave a corrupt and false answer to the following question:

"The Court: Do you know of any reason why you couldn't act as a fair and an impartial juror? A. No. I don't."

The United States claims, and the evidence substantiates the fact, that in the respondent's income tax return for the year 1944 he understated his net income tax to such an extent that he paid less than 5% of the tax liability thereon, and that on or about the 12th day of February, 1948, after investigation by the Internal Revenue Service of the District of North Dakota and a conference with the respondent and his attorney, the respondent paid an additional tax for the year 1944 amounting to $1,417.90 plus interest and a negligence penalty. The respondent claims in his return to the order to show cause and attempted to support such claim by his own and other testimony that the misstatement of net income was merely a mistake and that when it was called to his attention and the attention of his attorney it was disposed of without argument or difficulty through the payment of the additional amount due plus interest and penalty.

The respondent is and was at the time in question a farmer and cattle raiser. During the year of 1944 he had purchased cattle which he did not resell by the end of that year. He believed that the money paid in purchase thereof should be deducted as an expense item, failing to rea-

lize that the expenditure for the cattle amounted to a capital investment and not an expense. He also had charged, as repairs, items that amounted to capital investments. The attorney who represented him in 1948 when the adjustment was made testified in his behalf. He stated that he had not prepared the respondent's income tax return for the year 1944 but that it had been prepared by another lawyer at Langdon near where the respondent lived at the time in question; that he began doing the respondent's income tax work in about 1945 or 1946 and that he still does represent the respondent on tax matters; that he was present with the respondent at the time of a conference with a representative of the Internal Revenue Bureau; that when the errors were pointed out to them, they agreed immediately that the 1944 return was incorrect, that it was "just a mistake" and the additional amount plus a negligence penalty of 5% and interest was thereafter paid. The respondent himself testified that he believed he answered the Court's question as to whether or not he had had any "difficulty", "argument" or "controversy" over his State or Federal income tax returns correctly when he said, "No, just by mistake"; that he did not intend to mislead and still believed the answer to be a truthful one.

In the petitioner's case in chief there was introduced and received in evidence the original jury summons directing Freedland to appear in court for jury service. (Plaintiff's Exhibit 1.) On the reverse side of such summons there is a questionnaire which jurors are required to fill out and sign and leave with the Clerk of this Court at the time they appear for jury service. One question thereon is as follows:

"Have you ever been convicted of a criminal offense?"

The respondent answered that question by writing "No" as his answer and signing the questionnaire. The evidence indicates without contradiction that the answer was false in that on December 6, 1929, in the North Dakota State District Court, Second Judicial District, County of Cavalier, the respondent was found guilty by a jury of the crime of grand larceny and was sentenced by the Judge of such court to serve a term of two years and six months in the North Dakota State Penitentiary. After serving in the penitentiary for a period variously estimated by the witnesses at from ten to fourteen months, the respondent received a pardon from the Governor of North Dakota. The attorney who prosecuted the respondent and convicted him of grand larceny in 1929 testified in his behalf in this proceeding.

He testified to his having changed his mind with reference to the culpability of the respondent in the state case and that he himself was thereafter instrumental in obtaining the Governor's pardon for the respondent. He further testified that either at the time of the pardon or immediately prior thereto when petitions for the pardon were instituted, he had informed the respondent that a Governor's pardon would restore to him all civil rights he had lost by reason of the conviction and that the pardon "had the effect of, or wiped out the effects of the conviction". Without objection, he made the statement from the witness stand that he personally felt responsible for the respondent's incorrect answer in the summons' questionnaire in not fully advising the respondent with regard to the effect of the pardon, having told him only that it wiped out the conviction completely and in failing to add that of course, it couldn't wipe out the fact itself but only the effects thereof.

Subsequent to the trial of the Waldie case but before the expiration of the term of court at which the respondent was serving as a juror, the Court, upon being apprised of Freedland's denial that he had ever been convicted of a criminal offense and the probable falsity of such denial, called him into chambers and, upon inquiry from him, learned that the statement given was untrue. The Court then discharged him from further service on the jury panel. In answer to one of the Court's questions during such interview, the respondent had stated to the Court in partial explanation of why he put down the answer "No" when it should have been "Yes", "Well, I didn't know what it meant,

because the lawyer told me when I got a full pardon, you know, it didn't mean anything."

After the Government had established what the Court considered to be a *prima facie* case of contempt through giving false and misleading answers, the Court then allowed the Government to disclose by testimony of other jurors what occurred not only during the trial of the case but the actions and the statements of the respondent during the deliberations of the jury. Clark v. U. S., 289 U.S. 1, 14, 53 S.Ct. 465, 77 L.Ed. 993. This was upon the theory that after the establishment of a *prima facie* case the Court could then, in its discretion, admit in evidence the debates and ballots in the jury room as corroborative evidence supplementing and confirming the case already established. Courts must, of course, be ever vigilant to guard and protect the sanctity of jurors' deliberations, but as has been so well said by Justice Cardozo in Clark v. U. S., supra, 289 U.S. at page 13, 53 S.Ct. at page 469:

"Assuming that there is a privilege which protects from impertinent exposure the arguments and ballots of a juror while considering his verdict, we think the privilege does not apply where the relation giving birth to it has been fraudulently begun or fraudulently continued. * * * The privilege takes as its postulate a genuine relation, honestly created and honestly maintained. If that condition is not satisfied, if the relation is merely a sham and a pretense, the juror may not invoke a relation dishonestly assumed as a cover and cloak for the concealment of the truth. In saying this we do not mean that a mere charge of wrongdoing will avail without more to put the privilege to flight. There must be a showing of a *prima facie* case sufficient to satisfy the judge that the light should be let in. Upon that showing being made, the debates and ballots in the jury room are admissible as corroborative evidence, supplementing and confirming the case that would exist without them."

The Court also said, 289 U.S. at page 17, 53 S.Ct. at page 470:

"She has not been held to answer for any verdict that she has rendered, nor for anything said or done in considering her verdict. Matter of Cochran, supra [237 N.Y. 336, 143 N.E. 212, 32 A.L.R. 433]. She has been held *to answer for the deceit whereby she* made herself a juror, and was thereby placed in a position to vote upon the case at all. What was said and done in the jury room is not the gist of her wrongdoing. What was said and done in the jury room is no more than confirmatory evidence of her state of mind before."

Having determined that a *prima facie* case was established, the Court felt that as corroborative evidence what went on in the jury room should properly be received. The testimony in regard to the occurrences in the jury room was contradictory. There was evidence to the effect that even before the Government had completed the testimony on its side of the case the respondent made the statement to other jurors, all of whom were confined during the trial, that the defendant was not guilty; that the selection of the respondent as jury foreman was had without the opportunity for all of the jurors to be heard thereon; that the respondent talked and argued about not sending the defendant to the penitentiary, although they had been instructed by the Court to the effect that punishment in the event of a guilty verdict was not for their consideration but for the Court alone; that the respondent criticized the Government for collecting too much and squandering tax money; that the respondent, immediately after being elected foreman, made the statement that if they all voted not guilty it wouldn't take long and they could go home; that the respondent monopolized the conversation and prevented some of the jurors from having their say; that the respondent was opposed to conviction of the defendant even before the Government's case was completed, and that during the trial of the case he told some of the other jurors that he himself had had "dif-

ficulty" with the Internal Revenue Bureau in making amended returns and that he had paid an additional tax approximating $1,700; that after a verdict had finally been arrived at he indicated undue enthusiasm for the not guilty verdict by excessive demonstrations in the jury room and also in the court room after the verdict had been received and the Judge had left the court room.

Most of the jurors who sat in the Waldie case testified, at the behest of either the petitioner or the respondent. Many of the foregoing statements elicited by witnesses called by the Government were denied by other jurors who claimed the exact opposite insofar as conclusions may be drawn; that is, some of them testified that the selection of the foreman was open and above-board; that the respondent did not monopolize the argument; and that he called for the opinions of each of the jurors and invited, received and listened to all arguments that any of the jurors cared to present.

At the outset of this case, counsel called to the attention of the Court the importance thereof. The Court is not unmindful of its importance. This case is believed to be the first of its nature ever to arise in this jurisdiction. The jury system has been one of the greatest bulwarks in the defense of individual freedom. Its adoption marked a tremendous step forward in the protection of the individual from the whims of an all-powerful state and its arbitrary judges. The effectiveness of its operation depends upon the courage, the honesty and the intelligence of the individuals who make up our juries. The jury system as it has operated in the past has been a matter of pride to the judges and members of the bar of this court. It has had and justly earned the respect of the general public.

The charge, now, that a juror, sitting in the trial of a case, was guilty of obstructing the administration of justice by knowingly giving false answers and making misleading statements is of tremendous importance, not only to that juror but to the public, and not only for the present but also for the future so that we may continue to administer justice on a plane which will justify the public's continued confidence. This Court hesitated for some time before executing the order to show cause based upon the Government's petition, but it arrived at the conclusion that the charges made in the petition were too important not to be aired for the benefit of everyone concerned, including the general public. In the past, we have justifiably had complete faith in the honesty, the integrity and the good intentions of citizens who have served as jurors in this court and if anyone willfully jeopardizes that respect which the people have for jurors by giving false and misleading answers resulting in the obstruction of justice or an attempt thereat, such person must be prosecuted and punished, regardless of how squeamish or reluctant officials may feel about bringing to public view the circumstance of the incident.

It was with such thought in mind that this Court allowed the prosecution of the respondent for criminal contempt. The Court has now debated carefully the evidence offered by the Government in support of its petition and charge, as well as the evidence offered by the respondent. If this were a case where the civil rule of burden of proof would be applicable, namely, that the side carrying the burden of proof had to establish it only by "a fair preponderance of the evidence", the Court would be very much inclined to find the respondent guilty. Such is not the rule in a criminal proceeding. The rule here, as in all criminal cases, is that the respondent's guilt must be established "beyond a reasonable doubt". This Court has instructed hundreds of jurors in criminal cases to that effect, and in explaining to jurors what is meant by "beyond a reasonable doubt", this Court has said:

> "By 'reasonable doubt', I mean just what the term itself implies to your minds, a reasonable doubt, a doubt based upon reason as distinguished from mere conjecture of the mind or a possibility that the defendant may be innocent. It is an honest question left in your mind after giving the evidence

fair, full and conscientious consideration which, either because of a lack of evidence in the case or because of some evidence that has been introduced, naturally causes you to say to yourself, 'I don't know whether this man is guilty or not.' If you have that kind of question in your mind as to the defendant, then you have a reasonable doubt and you ought to acquit him. On the other hand, if, after full, honest and conscientious consideration of all of the evidence and the surrounding circumstances developed by the evidence, you can say to yourselves and do say to yourselves, 'I have an abiding faith in the guilt of this man; I am satisfied to a moral certainty that he is guilty as charged in the indictment,' then you are convinced beyond a reasonable doubt and your verdict should be guilty as charged."

█ The Court does not have the assistance of twelve jurors to determine the guilt or innocence of the respondent in this case, but the Court must apply to itself the same rule about which it instructs jurors in all criminal cases. Under that rule, this Court cannot say on the evidence introduced that the petitioner has established the guilt of the respondent beyond a reasonable doubt and that the Court has an abiding faith in the guilt of the respondent and is satisfied to a moral certainty that he is guilty as charged. There remains in my mind a reasonable doubt, a question, as to the intention, the willfulness of the respondent in giving the answers to the questions propounded to him by the Court and in answering the question on the jury summons. It may well be that the Court's questions on the *voir dire* examination were not sufficiently complete.

It may be that the Court should have followed up such questions with other questions which would have brought forth facts from the respondent showing the exact details surrounding what he called a "mistake" in filing his 1944 income tax return. It may be that the Government counsel should have requested the Court, when the opportunity was given, which it was, to ask further details in respect to the "mistake", and it may be that the respondent, an alien who came to this country at the age of 17, unable to speak this language, an excitable, impulsive, highly tense person, may not have intended to make a false statement when he said he had never been convicted of a crime, believing that his attorney's advice "that the pardon wiped out everything" justified the answer he gave. I cannot conclude that the Government has established its case beyond a reasonable doubt and accordingly must find the respondent not guilty.

The Court would be remiss to conclude this opinion without reference to certain unpleasantness occurring between counsel and certain unwarranted charges made against the agents of the Federal Bureau of Investigation and the Tax Department. From every bit of evidence offered, from everything the Court knows of the investigation, the representatives of the Government, including the attorney who prosecuted the case, were entirely justified in everything they did. They performed their duties as such duties should have been performed, and the fact that the Court cannot find that they have established guilt beyond a reasonable doubt does not detract from their high purpose nor the earnestness nor the honesty of their endeavors.

An order will be issued directing that the respondent be found not guilty and this proceeding dismissed.