430 P.2d 727

**BOARD OF TRUSTEES ELOY ELEMEN-
TARY SCHOOL DISTRICT, Horace Ches-
ley, Joe Bundy and Curtis Condry, Appel-
lants,**

v.

**Anthony McEWEN, by his Guardian ad
Litem, Obie McEwen, Appellee.**

**No. 2 CA–CIV 210.**

Court of Appeals of Arizona.

Aug. 4, 1967.

Rehearing Denied Oct. 27, 1967.

Review Denied Jan. 9, 1968.

Snell & Wilmer, by John J. Bouma, Phoenix, for appellants.

H. B. Daniels, Phoenix, for appellee.

HATHAWAY, Chief Judge.

The appellants, defendants below, have taken this appeal from an order of the superior court, Pinal County, granting a new trial to the appellee, plaintiff below. The plaintiff sued for injuries allegedly sustained as a result of an alleged assault by defendants Bundy and Condry, teachers at Eloy Elementary School. The complaint alleged that defendant Chesley and defendant Board of Trustees negligently permitted and allowed the defendants-teachers to assault the plaintiff. The case was tried to a jury which returned verdicts in favor of each of the defendants and judgment was entered thereon. Plaintiff then filed a motion for a new trial, accompanied by affidavits, alleging irregularities in the proceedings of the jury. These affidavits consisted of a sworn statement of Walter McCarthy, a juror, plaintiff's affidavit, and an affidavit of plaintiff's attorney.

On voir dire, the prospective jurors were asked by the court whether anyone was acquainted with the plaintiff or his father. One prospective juror admitted being a close friend of the plaintiffs and was excused. The court then asked "Anyone else know the plaintiffs in this particular case?" This question elicited no response from the prospective jurors. Mr. McCarthy's deposition,[1] submitted with plaintiff's motion for a new trial, reveals the following:

"Q  Now, did you know this minor defendant, Anthony McEwen?

A  I did previous.

Q  You did know him previously?

A  Uh huh.

Q  You knew him personally?

A  Personally—no, but I knew of him.

Q  Would you know him if you saw him?

A  Oh, yes.

Q  You knew him to recognize him?

A  Yes.

Q  How long have you known him, Mr. McCarthy?

A  Ever since I had been there the last time.

Q  Well, that would be how long?

A  Ten years.

*    *    *    *    *    *

Q  When was the first time you had any contact with him?

A  Oh, about two years previous.

Q  Two years previous to the trial?

A  Uh huh.

Q  What was that contact?

A  I was in the office when he tried to sell Bud that tire.

*    *    *    *    *    *

Q  What tire was that?

A  He stoled a General tire and was wheeling it around the block and my sister come in about that time and I was sitting there talking to her and—

Q  That was in Bud Harpain's filling station?

A  Yes, sir.

Q  What was your sister doing there?

A  She is the general manager of the joint. The place belongs to four of us.

1. The deposition was taken in the law office of plaintiff's counsel without notice to defense counsel.

Q The service station belongs to four of you?

A Yes.

Q Actually, he stole the tire from the service station?

A Yes.

Q In other words, he stole the tire from you and the other three?

    *    *    *    *    *    *

A Yes. Naturally, he was as guilty to me as anybody else.

    *    *    *    *    *    *

Q Did the boy ever steal anything else from the service station?

A Yes, he stole two or three pockets of wrenches around there and the kids—Grace had them arrested.

    *    *    *    *    *    *

Q How long before the trial did this occur, the stealing of the wrenches?

A About 18 months, I guess.

Q That was after the tire was stolen?

A Uh huh.

Q What was your general opinion of this boy, Mr. McCarthy?

A Just generally no good.

Q Is that the way you felt about him?

A Just exactly the way I felt about him.

Q After the jury started deliberations on the case, was there any discussion of this in the jury room?

A Yes, there was."

Mr. McCarthy further stated that in the jury room he made two attempts to tell the other jurors about these purported thefts but, upon the jury foreman's admonition, he "shut up." In response to other questions, the juror stated he was of the opinion that the plaintiff "was absolutely no good" and that the juror would not at any time believe him under oath.

The substance of the plaintiff's affidavit was that he was not acquainted with Mr. McCarthy, that he had never been arrested for stealing tires or wrenches and had no knowledge of the facts testified to by the juror in his deposition. Plaintiff's counsel gave an affidavit that he had no knowledge that the juror knew the plaintiff, that among the questions propounded to the prospective jurors were questions as to whether they knew any of the parties to the litigation and whether anyone had reason why he could not give a fair and impartial verdict in the case. He further stated that, subsequent to the trial, he was informed[2] that the juror McCarthy was guilty of misconduct and irregularities in the jury proceedings.

One of the grounds stated in plaintiff's motion for new trial was "there were irregularities in the proceedings of the Jury depriving Plaintiff of a fair trial." The trial court's order granting a new trial stated as follows:

"* * * the Court feels that although the verdict rendered by the Jury was justified by the evidence, the Court must set aside said verdict based upon the conduct of the juror who failed to acknowledge the fact that he knew the Plaintiff and that he had discussed the matter with other persons prior to time of trial and that this failure to acknowledge deprived the Plaintiff the opportunity to voir dire said juror and new trial should be granted."

The defendants contend that the trial court erred in considering the juror's deposition. The generally recognized rule that the verdict of the jury cannot be impeached by the affidavits of jurors is a court-created doctrine first announced by Judge Mansfield in Vaise v. Delaval, 1 Term R. 11 (K.B. 1785). There the affidavit was to the effect that the jury's verdict was achieved by resort to chance—the jurors being divided in their opinion, "tossed up" and those favoring the plaintiff

---

2. Absent any showing to the contrary, we indulge in the presumption that this information was not garnered in violation of opinion No. 200 of the Arizona State Bar Committee on Ethics.

won the toss. In rejecting the affidavit, Lord Mansfield stated:

> "The Court cannot receive such an affidavit from any of the jurymen themselves, in all of whom such conduct is a very high misdemeanor; but in every such case the Court must derive their knowledge from some other source, such as some person having seen the transaction through a window, or by some such other means." 8 Wigmore § 2352, p. 696 (McNaughton rev. 1961)

Professor Wigmore points out that the rule that a juror may not impeach his verdict appears to be founded on three independent and general principles:

1. Privileged communications
2. Parol evidence rule
3. Self-stultifying testimony

8 Wigmore, Evidence § 2345 (McNaughton rev. 1961).

■ The principle of privileged communications between jurors clearly would not apply in this case. The principle prohibits the disclosure of communications with a fellow juror without the latter's consent. The subject affidavit does not disclose such a communication.

■ The policy of the parol evidence rule prohibits the disclosure of a juror's motives, beliefs, and misunderstandings preceding and leading up to the final act of uttering the verdict. 8 Wigmore, Evidence § 2345 (McNaughton rev. 1961). The principle is that where the existence and tenor of a jural act are in issue, the outward utterance as finally and formally made, and not prior and private intention, is taken as exclusively constituting the act. 8 Wigmore, Evidence § 2348 (McNaughton rev. 1961). The verdict is the sole embodiment of the juror's act:

> "The policy which requires this is the same which forbids a consideration of the negtiations of parties to a contract leading up to the final terms as deliberately embodied in their deed, namely, the loss of all certainty in the verdict, the impracticability of seeking for defi-

niteness in the preliminary views, the risk of misrepresentation after disclosure of the verdict, and the impossibility of expecting any end to trials *if the grounds for the verdict* were allowed to effect its overthrow." (Emphasis supplied) 8 Wigmore, Evidence § 2349 (McNaughton rev. 1961).

The parol evidence principle would be inapplicable here since the subject matter of McCarthy's sworn statement does not pertain to the *grounds* for the verdict, but rather the juror's qualifications.

■ As for the doctrine of self-stultifying testimony (Lord Mansfield's rule) this principle forbids the use of a juror's testimony to prove his own misbehavior. It is based on the principle "nemo turpitudinem suam allegans audietur" (a witness shall not be heard to allege his own turpitude). 8 Wigmore, Evidence § 2345 (McNaughton rev. 1961). Professor Wigmore criticizes this doctrine:

> "Finally, it must be pointed out that while Lord Mansfield's own statement of the rule obliged the proof of the misconduct to defend solely on the testimony of 'some person having seen the transaction through a window or by some such other means,' his successors have committed an absurdity which he would hardly have condoned. A bailiff or other court officer, who may have been present at the jury's deliberations, may by universal concession (§ 2354 infra) prove their misconduct though it is a gross breach of duty (except in one or two jurisdictions) for him to attend or overhear. Thus, not only does the rule tempt the parties to seduce the bailiffs to tricky expedients and surreptitious eavesdroppings, but the law, while with one hand it sanctimoniously puts away the juryman who reports his own misconduct done during the privacy of retirement, yet with the other hand it inconsistently invites to the same witness stand the bailiff whose shameless disregard of his duty in intruding upon that privacy forms his only qualification as a witness and the sole tenor of his

testimony. If there cannot be any principle in this rule, it should at least possess logic." 8 Wigmore, Evidence § 2353, p. 698 (McNaughton rev. 1961).

The doctrine, if applicable at all, is predicated upon misconduct in the jury room itself and therefore would be inapplicable here. Consequently, it would seem, under Wigmore's analysis of the justification for the rule that a juror may not impeach his verdict, there is no valid basis for rejection of the affidavit of juror McCarthy.

In this jurisdiction the rule that a juror may not impeach his verdict has been oft reiterated. Southwest Cotton Company v. Ryan, 22 Ariz. 520, 199 P. 124 (1921); Brooks v. McDevitt, 40 Ariz. 221, 11 P.2d 826 (1932); Wilson v. Wiggins, 54 Ariz. 240, 94 P.2d 870 (1939); Hall v. Delvat, 95 Ariz. 286, 389 P.2d 692 (1964). See Swinehart v. Baker, 6 Ariz.App. 30, 429 P.2d 522 (1 CA–CIV 203 filed June 27, 1967). In Southwest Cotton Company v. Ryan and Brooks v. McDevitt, supra, the rejected affidavits were directed to alleged misconduct of the jury in returning a quotient verdict. In Hall v. Delvat, supra, the conduct of three jurors in the jury room was the subject of the affidavit. In Swinehart v. Baker, supra, the rejected affidavit referred to *another* juror's visit to the scene of the accident during trial, his discussion with *other* jurors, and discussion of facts of the case by jurors during trial.

In some jurisdictions, apart from statute, an exception to the general rule with regard to jurors' affidavits is recognized where the bias or disqualification of a juror was concealed by false answers on voir dire. E.g. Sopp v. Smith, 59 Cal.2d 12, 27 Cal. Rptr. 593, 377 P.2d 649 (1963); Kollert v. Cundiff, 50 Cal.2d 768, 329 P.2d 897 (1958); Mathisen v. Norton, 187 Wash. 240, 60 P.2d 1 (1936); Allison v. Department of Labor and Industries, 66 Wash.2d 263, 401 P.2d 982 (1965), by implication; State by Lord v. Hayden Miller Company, 263 Minn. 29, 116 N.W.2d 535 (1962);

Department of Public Works and Buildings v. Christensen, 25 Ill.2d 273, 184 N.E.2d 884 (1962); Woodworth v. Kansas City Public Service Company, 274 S.W.2d 264 (Mo.1955); Drury v. Franke, 247 Ky. 758, 57 S.W.2d 969, 88 A.L.R. 917 (1933); see also Annotation 48 A.L.R.2d 971.

The case of Wilson v. Wiggins, supra, bears a factual resemblance to the instant situation in that the affidavits sought to disclose the bias and prejudice of a juror. The defendant's motion for a new trial was supported, just as here, by his affidavit and that of his attorney stating: that the court asked the jurors if any of them knew the defendant; that a particular juror remained silent; that neither the defendant nor his attorney knew the juror or that he knew them and had no reason to believe that he knew the defendant until after the verdict; that after the return of the verdict, three other jurors came to the defendant and his attorney and told them that the offending juror had stated in the jury room, before a verdict was reached, that he knew the defendant "as a bootlegger and a gambler and he wouldn't believe his word on oath, or words to that effect."

These affidavits were supported by four jurors' affidavits as to the comments in the jury room. The Supreme Court of Arizona upheld the trial court's action in striking these impeaching affidavits, stating:

> "This concealment was first discovered in the jury room by his fellow jurors while the jurymen were considering the case. *There is no evidence of any concealment or any bias* or prejudice on the part of Gibbs *other than that contained in the affidavits of his fellows,* and such knowledge was obtained by the affiants in their capacity as jurors and not otherwise." (Emphasis supplied.)

54 Ariz. at 243, 94 P.2d at 871.

The court quoted from McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915), to explain the reason for the rule disallowing affidavits or statements or

depositions of jurors to impeach their verdicts:

"'* * * let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harrassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.

"'The rule on the subject has varied. * * * And, of course, the argument in favor of receiving such evidence is not only very strong, but unanswerable—when looked at solely from the standpoint of the private party who has been wronged by such misconduct. The argument, however, has not been sufficiently convincing to induce legislatures generally to repeal or to modify the rule. For, while it may often exclude the only possible evidence of misconduct, a change in the rule "would open the door to the most pernicious arts and tampering with jurors." "The practice would be replete with dangerous consequences." "It would lead to the grossest fraud and abuse" and "no verdict would be safe." (Citations omitted.)'"

54 Ariz. at 245, 94 P.2d at 872.[3]

The *Wilson* case, supra, is distinguishable from the case at bar in that the affidavits were executed by jurors other than the one whose conduct was challenged. The juror's bias and prejudice in *Wilson* revealed itself only in the jury room during the course of deliberations. The affidavits referred to matters which occurred in the sanctity of the jury room. The same is true of the other three above-mentioned cases. Under Professor Wigmore's analysis, application of the "privileged communications" principle or the "parol evidence" principle would justify their exclusion.

One other Arizona case should be mentioned, State v. Murphy, 79 Ariz. 161, 285 P.2d 614 (1955), in which we find the following statement of the rule:

"[T]he law is settled in this jurisdiction that affidavits of jurors who concur in the verdict are not competent to impeach that verdict *as to matters*—such as are stated above—*which are inherent therein.*" (Emphasis supplied) 79 Ariz. at 164, 285 P.2d 615.

The affidavits in this case concerned the performance of an experiment by certain female jurors to prove the physical possibility of the act testified to by the prosecutrix. Once again we see enforcement of

3. But see Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), in which Justice Cardozo made the following comments concerning the admission of testimony as to the conduct of a juror during deliberation:

"For the origin of the privilege we are referred to ancient usage, and for its defense to public policy. Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world. The force of these considerations is not to be gainsaid. But the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process. The function is the more essential where a privilege has its origin in inveterate but vague tradition, and where no attempt has been made either in treatise or in decisions to chart its limits with precision."

the cloak of protection afforded the jury in its deliberations. The Supreme Court clearly delineated the scope of the rule's ban—"to matters * * * which are inherent" in the verdict.

■ The juror's deposition discloses circumstances not inherent in the verdict and we therefore find that the trial court's consideration of its content in ruling upon the motion for a new trial was not a departure from precedent. The right to a trial by jury means an impartial jury and nondisclosure, *upon proper inquiry* on voir dire examination, of bias or prejudice which would render a juror vulnerable to challenge, is ground for a new trial. Wilson v. Wiggins, supra.

■ The defendants further contend that, assuming consideration of the juror's affidavit was permissible, the juror was not guilty of concealment of facts indicative of bias and prejudice since the questions propounded on voir dire did not require a response from him. As we have previously indicated, the court questioned the prospective jurors with regard to being "acquainted with" or "knowing" the plaintiffs. Webster's Third International Dictionary defines the word "acquainted":

"* * * being known to and having knowledge of * * * having personal knowledge of."

The word "know" is defined:

"* * * recognize as being an object of perception identical with a previous object of perception: recognize as familiar (e. g. she knew her father as soon as she saw him)."

In the light of these definitions and, more important, because of the common meaning attributable to such inquiry, we cannot agree that juror McCarthy was under no duty to respond to the questions. A reading of his deposition makes it apparent that he equated "know" with "having knowledge of." We therefore see no merit in defendants' argument that the scope of the voir dire inquiry was not broad enough to elicit the admissions made in the deposition.

The defendants submitted an affidavit of the jury foreman in support of a motion to reconsider and rescind the order granting the new trial. In substance it stated that only one comment was made by juror McCarthy in the jury room which did not affect the affiant's view nor did he believe it influenced the other jurors. We are not here concerned with occurrences in the jury room and therefore the effect of any statements made there is not an issue. Our only concern is the effect of the juror's failure to respond to the voir dire inquiry, thereby depriving plaintiff of an opportunity to exercise his valuable right of challenge.[4]

■ The importance of the right of peremptory challenge is explained in Drury v. Franke, 247 Ky. 758, 57 S.W.2d 969 (1933), in a quotation from Shulinsky v. Boston & Maine R. R., 83 N.H. 86, 139 A. 189:

"* * * the right to challenge a given number of jurors without showing cause is one of the most important rights to a litigant; any system for the empaneling of a jury that prevents or embarrasses the full, unrestricted exercise of the right of challenge must be condemned; a litigant cannot be compelled to make a peremptory challenge until he has been brought face to face in the presence of the court, with each proposed juror, and an opportunity given for such inspection and examination of him as is required for the due administration of justice; the right to reject jurors by peremptory challenge is material in its tendency to give the parties assurance of the fairness of a trial in a valuable and effective way; the terms of the statutes with reference to peremptory challenges are substantial rather than technical; such rules, as aiding to secure an impartial, or avoid a partial, jury, are to be fully enforced; the voir dire is of service not only to en-

---

4. The clerk's minute entry discloses that no peremptory challenges were exercised.

-able the court to pass upon a juror's -qualifications, but also in assisting counsel in their decision as to peremptory -challenge; the right of challenge includes the incidental right that the information elicited on the voir dire examination shall be true; the right to challenge implies its fair exercise, and, if a party is misled by erroneous information, the right of rejection is impaired * * *."

57 S.W.2d at 984.

We are of the opinion that the trial court's determination of the question of whether a new trial should be afforded a litigant who was unaware of a juror's disqualification until after trial and who, by due diligence could not have sooner ascertained it, is a matter properly within the exercise of his discretionary power. See Woodworth v. Kansas City Public Service Company, 274 S.W.2d 264 (Mo.1955). The trial judge presided at the voir dire examination and was in a superior position to gauge the prejudicial effect of non-disclosure of facts relevant to the juror's bias. Therefore, in accord with the liberal view of the appellate courts of this jurisdiction in upholding a trial court's grant of a new trial, no manifest abuse of discretion having been demonstrated, we will not interfere.

The final argument of defendants' counsel is that defendant Chesley[5] is entitled to judgment on both counts of the complaint and the defendant Board of Trustees is entitled to judgment on the second count.[6]

As a general rule, apart from statute, a new trial in a proper case, may be restricted to the issues between some of the parties, where justice does not otherwise require. 66 C.J.S. New Trial § 12(a). Appellate courts have reversed orders granting a new trial as to *all* defendants when it appears, as a matter of law, that there is no liability on the part of one or more defendants. E. g. Steele v. Peoples Natural Gas Company, 386 Pa. 439, 127 A. 2d 96 (1956); Dahle v. Goodheer, 38 N.J. Super. 210, 118 A.2d 547 (1955).

We have recently declined to interfere with the trial court's discretion in ordering a new trial as to all issues. See State v. Southern Arizona Land Co., 5 Ariz.App. 139, 424 P.2d 181 (1967). That holding has some pertinency here. As stated in Wecksler v. City of Philadelphia, 178 Pa. Super. 496, 115 A.2d 898 (1955):

"'Generally, where there are several defendants, if the record shows that the interests of justice require a new trial as to all of them, an order to that effect will not be disturbed on appeal.'" 115 A.2d at 901.

See also: Thomas v. DeSabato, 168 Pa. Super. 586, 80 A.2d 862 (1951).

An examination of the memoranda filed in opposition to the motion for a new trial and also in support of the motion to reconsider and rescind the order granting a new trial discloses that the defendants assumed an identity of position. Their argument was presented on behalf of "the defendants" and was directed solely to the propriety of granting a new trial. No attempt was made to distinguish their respective positions not to call to the trial court's attention the fact that ruling on their motions for a directed verdict had been reserved. We believe therefore that if the trial court erred in granting a new trial as to defendants School Board and Chesley, the error was invited by them and therefore cannot be urged on appeal. Garrett v. Holmes Tuttle Broadway Ford, 5 Ariz. App. 388, 427 P.2d 369 (1967).

Absent the requisite showing of a manifest abuse of discretion of the trial court's ruling on the motion for a new trial, the order appealed from is affirmed.

MOLLOY and KRUCKER, JJ., concur.

---

5. Defendant Chesley was the Superintendent of the Eloy Elementary School District.

6. Liability under Count I was predicated on the doctrine of *respondeat superior.* Count II alleged negligence.