**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION,**
Plaintiff,

v.

**UNITED TELEPHONE COMPANY OF FLORIDA, Defendant.**

Civ. No. 72–17.

United States District Court,
M. D. Florida,
Fort Myers Division.

July 3, 1973.

178

Smathers & Thompson, Miami, Fla., for plaintiff; Blecher & Collins, Harold R. Collins, Jr., Maxwell M. Blecher, Gary W. Hoecker, Los Angeles, Cal., Daniel R. Solin, New York City, of counsel.

Warren E. Baker, Westwood, Kansas, Edwin L. Mason, Tallahassee, Fla., Lawrence Kill, Jerold Oshinsky, Anderson, Russell & Kill, P. C., New York City, for defendant.

### ORDER

KRENTZMAN, District Judge.

This is an action brought pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover for damages from defendant's alleged violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, together with a pendent claim for tortious interference with contractual relationships. Before the Court is plaintiff's Rule 37 motion to compel, presenting for consideration the applicability of the attorney-client privilege in an action for damages resulting from alleged "sham" litigation as described in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

The controversy arises out of International Telephone and Telegraph Corporation's proposed sale to and installation of a telephone system at the Christian and Missionary Alliance Foundation retirement facility known as Shell Point Village. Shell Point Village, at Ft. Myers, Florida, is located within the geographic area served by defendant United Telephone Company of Florida, as holder of a Certificate of Public Convenience and Necessity issued by the Florida Public Service Commission.

The plaintiff alleges, *inter alia,* that defendant violated the Sherman Act by filing a complaint before the Florida Public Service Commission "to prevent execution of the ITT/SPV contract knowing that there existed no legal basis for the complaint and using the sham and frivolous proceeding to terminate the contractual relationship between SPV and ITT."

The central aspect of the plaintiff's claim being the litigation before the Public Service Commission, the plaintiff filed interrogatories and requests for production of documents pertaining to matters surrounding the institution and prosecution of the action before the Commission, as well as prior meetings, memoranda and discussions relative to the plaintiff's sale of telephonic equipment at the Shell Point Village.

The defendant filed objections to certain of the interrogatories and requests for production based, among other things, on the attorney-client and work product privileges, whereupon the plaintiff filed this motion to compel pursuant

to Rule 37 of the Federal Rules of Civil Procedure.[1]

# I

## *Discovery and Privileged Matters*

■■ Rule 26 of the Federal Rules of Civil Procedure allows discovery in civil cases "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." The same common law rules of privilege govern the scope of discovery as generally govern the admissability of evidence at trial. United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953).[2] Accordingly, material subject to the attorney-client or work products privileges is not discoverable unless said material falls within some exception to the rule.

■ The rule relative to the attorney-client privilege is that the client has a privilege, which may be waived, to refuse to disclose and to prevent his attorney and others within the confidential relationship from disclosing, communications between the client and his attorney within the course of the professional relationship.

■ Once the elements of the attorney-client privilege are established, that privilege has, in the past, been as absolute as any known in the law. However, there have been exceptions to the inviolability of this privilege, one being where the communications made by the client to his attorney were made for the purpose of being guided or assisted in the commission of a crime or fraud. Pollock v. United States, 202 F.2d 281 (5 Cir. 1953).

In *Garner, supra,* at note 2, the United States Court of Appeals for the Fifth Circuit mentioned the traditional crime-fraud exception to the privilege and went on to say:

"But we do not consider unavailability of the privilege to be confined to the narrow ground of prospective criminal transactions. The differences between prospective crime and prospective action of questionable legality, or prospective fraud, are differences of degree, not of principle." 430 F.2d at 1103.

Accordingly, Garner indicates that there are no nice tests for the determination of whether the privilege should or should not be available. The privilege may be overcome, not only where fraud or crime is involved, but also where there are other substantial abuses of the attorney-client relationship.

The crux of the plaintiff's contention here is that the defendant's communications with counsel fall within the improper purpose doctrine in that they were made for the purpose of instituting a "sham" proceeding before the Florida Public Service Commission.[3] That con-

---

1. The motion pertains only to the defendant's objections of privilege to plaintiff's first set of interrogatories numbers 8 (d), 8(e), 9, 10, 12, 13, and 14 and documents identified in response to paragraphs 7, 8 and 14 of the plaintiff's request for documents. The motion is not directed to defendant's objections on other grounds of burden, vagueness or materiality.

2. Rule 43 of the Federal Rules of Civil Procedure governs the admissability of evidence at trial in a federal civil case. The Court recognizes that the availability of privilege within the context of a case such as this can involve problems relative to choice of law. However, this is a federal question case. Although pendent state claims are involved, in similar circumstances it has been held that the federal courts should apply their own rules of privilege where substantial state interests are not involved. Garner v. Wolfinbarger, 430 F.2d 1093 (5 Cir. 1970). At any rate there does not appear to be a conflict at the present time between the federal and state rules involved here. Gard, Florida Evidence, Rule 422 et seq., pp. 668–678 (1967).

3. It should be noted that the plaintiff does raise other grounds upon which it contends the privilege should be overcome. See pages 15–35 of the plaintiff's reply memorandum filed October 25,

tention is also the crux of the plaintiff's complaint.[4]

## II

### Movant's Burden

█ The question next arises as to the burden of proof necessary to overcome a well-pleaded claim of attorney-client privilege. The courts of the United States have not followed the older English rule that the mere charge of illegality will overcome the privilege to be given to confidential communications. As the Supreme Court stated in Clark v. United States, 289 U.S. 1 (1933) at 14, 53 S.Ct. 465 at 533, 77 L.Ed. 993:

> " . . . we do not mean that a mere charge of wrongdoing will avail without more to put the privilege to flight. There must be a showing of a *prima facie* case sufficient to satisfy the judge that the light should be let in."

The lower courts' interpretations of what constitutes a *"prima facie* case" has not been uniform. It was held in Securities & Exchange Commission v. Harrison, 80 F.Supp. 226 (D.D.C.1948) that in order to establish a *prima facie* case there had to be evidence sufficient "to reasonably justify a verdict of wrong doing which would be sustained." 80 F.Supp. at 232. More recently the United States Court of Appeals for the Eighth Circuit wrote in Pfizer, Inc. v. Lord, 456 F.2d 545 (1972) at 549:

> "Under present law, a party seeking to overcome a claim of attorney-client privilege by invoking the improper purpose exception has the burden of producing *sufficient evidence to sustain a finding* that the challenged communications were made in furtherance of a crime or tort." (emphasis supplied).

The Fifth Circuit, however, has avoided the use of the term *"prima facie"* in

---

1972. The Court has considered those other grounds and finds that they would provide little independent authority to overcome the attorney-client privilege, although they have been considered insofar as they tend to add color to the plaintiff's main charge.

4. The plaintiff seeks to prosecute this case as falling within the "sham" exception to the so-called *"Noerr doctrine,"* enunciated in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In that case a group of trucking companies sued a group of railroads for injunctive relief and damages relative to an alleged conspiracy to monopolize the long distance freight business. The Supreme Court held that the complaint failed to state a claim under the Sherman Act insofar as it alleged no more than defendant's attempts to solicit governmental action with respect to the enforcement or passage of laws. In so holding, the Supreme Court stated: "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Id.* at 138, 81 S.Ct. at 530.

While *Noerr* dealt with attempts to influence the executive and legislative branches of government, the right of petition also protects those seeking access to courts and administrative agencies, and consequently the principles of *Noerr* apply in the latter situations as well. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

The relevant governmental body in the instant case is the Florida Public Service Commission which was created by an act of the state legislature, consists of three elected commissioners and possesses executive, legislative and quasi-judicial powers.

It was also said in *Noerr*, however, that there might be instances where what appear to be bona fide attempts to influence governmental action are "a mere sham to cover up what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." 365 U.S. at 144, 81 S.Ct. at 469. Subsequently, alleged abuses of the judicial and administrative processes have been held to be actionable as within the "sham" exception to *Noerr*. *E. g., California Motor Transport Co., supra.*

relation to the burden of overcoming the privilege. In *Pollock, supra,* it was held that the attorney-client privilege was unavailable where evidence was introduced giving "color to the charge" of fraud. More recently, the Fifth Circuit in *Garner, supra,* spoke only in terms of a showing of "good cause", why the privilege should not be invoked, listing for the trial court many factors which might contribute to such a showing.

## III

### The Proceeding Before the P.S.C.

The Court therefore must determine whether the plaintiff has established good cause to show why the defendant may not invoke the attorney-client privilege. Since there has been no evidentiary hearing, the Court's determination is based upon a consideration of the exhibits attached to the motion and responsive memoranda, the interrogatories and depositions as they have been referred to the Court by the parties in their briefs, the allegations of the pleadings and the undisputed facts, whenever they might be found.

It is the Court's opinion that a finding of good cause is dependent upon whether the plaintiff has made a colorable showing that the proceeding before the Florida Public Service Commission was a sham.

### A. *United's Complaint.*

On July 24, 1970, the defendant United Telephone filed with the Commission its complaint against the Christian and Missionary Alliance Foundation alleging that the Foundation was about to engage in the business of "affording telephonic communication to the public which United Telephone has reason to believe and does believe is for hire to serve the residents, guests, businesses and general public at Shell Point Village and also certain residents in a residential subdivision located adjacent to Shell Point Village property and known as Palm Acres" without a certificate of public convenience and necessity as required by Florida Statutes § 364.33, F. S.A.

On August 7, 1970, the Commission entered an *ex parte* order directing the Foundation to cease and desist the acts "as outlined in said complaint" filed by United Telephone Company, or show cause why it should not do so. *See,* United Telephone Co. of Florida v. The Christian and Missionary Alliance Foundation, Inc., Docket No. 70305 TP (Fla. Pub.Serv.Comm.Order No. 4927).

Subsequent to the August 7 order ITT was allowed to intervene in the proceeding before the Commission and on September 8, 1970, the Foundation filed its answer to the complaint. On July 15, 1971, the Foundation filed a motion with the Public Service Commission to amend its previous order of August 7, 1970. In its Order No. 5216 entered September 13, 1971, the Commission denied the motion to amend, but did note:

"Although the Commission is denying this motion on procedural grounds, we feel constrained to inform the respondent, Christian and Missionary Alliance Foundation, Inc. that the type of facilities they now wish to have authorized by an amended order are either lawful or outside our jurisdiction and obviously are not prohibited by the terms of Order No. 4927."

In January of 1972 the Christian and Missionary Alliance Foundation cancelled its contract with ITT. Thereafter United Telephone filed a motion to dismiss ITT as a party in the Public Service Commission proceeding and that motion was granted April 7, 1972. *Id. See,* Order No. 5380.

On June 1, 1972 the Foundation filed a motion to dismiss defendant's complaint before the Commission on the grounds that the contract with ITT had been cancelled. The Commission denied the motion of the Foundation stating that "[T]he existence of the contract does not form the basis of United's

Complaint and the Foundation's motion failed to address itself to the allegation of the wrongful acts referred to in the complaint." *Id. See* Order No. 5528 at page 3 (Sept. 21, 1972).

The Public Service Commission went on to say: " . . . the Commission is mindful of the extremely serious nature of the issues of controversy which have been established; that they are peculiar to the jurisdiction of this Commission, and that they have not been adjudicated. Until we make some adjudgment of these issues, this Motion to Dismiss does not lie." *Id.* In spite of all this, however, the Commission construed the Foundation's motion as a "suggestion that the docket should be closed" and closed the case because the Foundation " . . . has abandoned its plan to proceed with the construction . . . of a telephone line," thus leaving unresolved these "extremely serious" issues.

### B. *The Electricity Case.*

Plaintiff's allegations that United's complaint before the Commission was sham arise essentially from the similarity between the issues raised in United's complaint and a case dealing with electricity that the Commission had only shortly before determined.

In the electricity case, Re Procedures Governing Sales of Electricity for Resale, 85 P.U.R.3d 107 (April 23, 1970), the Florida Public Service Commission determined that "trailer parks, condominium housing units, apartment complexes, shopping centers, marinas, and other such businesses" engaged in the resale of electricity to their tenants are not "public utilities" within the meaning of Fla.Stat. § 366.02 because the resale of electricity was not *"to the public"* as that phrase has ordinarily been interpreted. The distinction according to the commission was that the resale by the landlord was a sale to tenants only, resting upon that special relationship and not upon the public utilities' duty to serve all members of the public indiscriminately.

Accordingly, the Commission determined that since the persons or businesses were not public utilities, their resale practices and rates were beyond the regulatory jurisdiction of the Commission. Expressing concern over the abuses that could exist under such a circumstance, the Commission noted that the utilities' selling of electricity to landlords for resale, a situation which the Commission found to be common, is a violation of the tariffs each utility then had on file with the Commission and consequently a violation of Fla.Stat. § 366.12. Consequently, the Commission ordered the electric utilities companies to enforce their respective tariff provisions relating to the resale of electricity.

The complaint filed by United Telephone against the Christian and Missionary Alliance Foundation accused the Foundation of violating Florida Statutes § 364.33. That section prohibits the construction or operation of any "telephone line" without first obtaining from the Commission a certificate of public convenience and necessity.

A "telephone line" is defined under the Florida Statutes to include:

" . . . conduits, ducts, poles, wires, cables . . . and all devices . . . used and operated to facilitate the business of affording telephonic communication service *to the public for hire* within this state." Fla.Stats. § 364.02(5), F.S.A. (emphasis supplied).

Plaintiff's contention is that since the Commission found that a landlord's resale of electricity to his tenants was not a sale "to the public for hire", the installation and operation of telephonic equipment to the tenants of Shell Point Village would not be service "to the public for hire," within the meaning of Fla.Stats. § 364.02. While it appears to the Court that the phrase, "to the public" would have a closely similar if not

identical meaning within the context of the two statutes, the ultimate question of whether the service to be offered at the Shell Point Village was service "to the public" as that term has been defined, would be a question of fact. The exhibits on file in this cause indicate that the projected size of Shell Point Village might be somewhat larger than the "trailer parks" and "condominium housing units" discussed in the Commission's electricity case and consequently the defendant may have had some basis for believing that the Commission would find that this was indeed a sale to the public.[5] Moreover, there was the further allegation in the complaint before the Commission that the Foundation was going to provide telephone service to the Palm Acres subdivision. This allegation, if proven, would place the Christian and Missionary Alliance Foundation in an entirely different position from the landlords mentioned in the electricity case.

■ A sham pleading is one which is good in form, but false in fact. Bollen v. Woodhams, 68 Colo. 322, 190 P. 427 (1920). The Court is unable to determine from the allegations and orders before the Commission or from the exhibits before the Court whether United's complaint meets this definition. The matter might be simpler if the issues before the Commission were ever resolved. They were not. The proceeding was not terminated in favor of either party, but instead was mooted by the passage of time.

■ It should be noted that the issue of the legality under Fla.Stat. § 364.33, F.S.A. of the communications project contemplated at the Shell Point Village has been raised before this Court in the defendant's counterclaims. If such allegations were sham before the Commission, they are equally sham before this Court. But again, the determination requires not only resort to the law but the consideration of facts. While the Court finds that there is suspicion raised as to the *bona fides* of the proceeding brought by the defendant before the Public Service Commission, the plaintiff has not *prima facie* established that the proceeding was sham. Further, the Court finds that ITT's motion, together with the exhibits and other material in support thereof, falls short of setting forth good cause to overcome the attorney-client privilege.

This finding is without prejudice to plaintiff bringing further evidence to the attention of the Court at some later date in order to establish good cause.

### IV

### *Establishing the Privilege*

■■ The Court has previously discussed the burden of the party desiring discovery to overcome a properly established claim of privilege. However, the determination of whether a communication falls within the scope of privilege, be it attorney-client or otherwise, is a complex conclusion of law. The attorney-client privilege is a fragile one which will not be available unless all of the elements of the privilege are present.[6] Consequently, it is the party avoiding discovery who has the initial burden of establishing the existence of

5. The exhibits indicate that the Shell Point Village complex was to be composed of a 200 room hotel, 550 garden apartment units, 200 high rise apartment units, as well as medical and nursing facilities, shops and general offices. ITT states that the telephone facility was to be a system capable of providing the Shell Point Village with: (1) access to long distance calls through interconnection with the facilities of the defendant; (2) access to local and intrastate toll call service through interconnection with defendant's facilities and (3) intercom facilities for the internal needs of Shell Point Village.

6. Professor Wigmore sets out the essentials of privilege in a definitional formula: "(1) Where legal advice of any kind is sought (2) from a professional legal

the privilege. McCormick, Evidence, § 92 at 184 (1954); Camco Inc. v. Baker Oil Tools, Inc., 45 F.R.D. 384 (S.D.Tex. 1938); 8 Wright & Miller, Fed.Prac. & Proc. § 2016 at 126 (1970).

Some of the matters into which the plaintiff seeks discovery relate to meetings at which a number of people were in attendance. While the defendant is claiming the attorney-client privilege for all that occurred at such meetings, it is apparent that the mere attendance of an attorney at a meeting, even where the meeting is held at the attorney's instance, does not render everything done or said at that meeting privileged. For communications at such a meeting to be privileged, they must have related to the acquisition or rendition of professional legal services and must have retained a confidential character. Similarly, some of the matters to which the defendant claims a privilege relate to meetings among employees and agents of the corporations at the direction, but not in the presence of an attorney. It would appear that the matters discussed at such a meeting would not be allowed the attorney-client privilege, but might be subject to the more limited work-product privilege. *See* McCormick, Evidence § 100 at 204 (1954). While the privilege is available to the corporation and to its "house counsel", there is also potential for abuse of the privilege under such circumstances. In the final analysis, it is the Court's duty and not the duty of the one asserting the privilege to determine whether a communication is, in fact, privileged. The Court finds that under the circumstances of this case, it is not possible to make that decision without resort to the communications themselves. Consequently, final determination of the availability of the attorney-client privilege to specific

items will await an *in camera* inspection of the answers to interrogatories and documents in question. The purpose of this examination is not to determine whether there is good cause to *overcome* the privilege, but rather to determine whether the items are, as a matter of law and fact, entitled to the privilege at all.

## V

### Waiver and Discovery

Testimonial privileges are exceptions to the general duty of every person to give testimony upon all facts inquired of in a court of law. 8 Wigmore, Evidence, § 2285 at 527. The attorney-client privilege is the oldest of the testimonial privileges, originating contemporaneously with the right of testimonial compulsion. *Id.*, § 2290 at 543. The purpose of the attorney-client privilege is to promote freedom of consultation between client and legal advisors without apprehension of subsequent compelled legal disclosure. *Id.*, § 2291 at 545. However, the privilege was intended as a shield, not a sword. Consequently, a party may not insist upon the protection of the privilege for damaging communications while disclosing other selected communications because they are self-serving.

If the client chooses to disclose secrets within the privilege, then he waives it and cannot later insist upon his or his attorney's silence based upon the privilege. Hunt v. Blackburn, 128 U.S. 464, 9 S.Ct. 125, 32 L.Ed. 488 (1888). While the client does not waive the privilege by testifying generally in the cause or testifying as to facts which were the subject of consultation with his attorney, if the client or his attorney at his instance takes the stand and testifies

adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by

himself or by the legal adviser, (8) except the protection be waived." 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961).

to privileged communications in part this is a waiver as to the remainder of the privileged consultation or consultations about the same subject. *Id.*; *See also*, McCormick, Evidence, § 97 at 197; 58 Am.Jur. Witnesses, § 526 at 295. Similarly if a party-client introduces part of his correspondence with his attorney, the production of all of the correspondence could be demanded. Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc., 32 F.2d 195 (2nd Cir. 1929).

 However, as the United States Court of Appeals for this circuit has recognized upon several occasions,[7] the testimonial privilege relative to confidential communications will be available only if all four of Professor Wigmore's conditions set out below are satisfied:

"(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered*.

(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation." *Id.*, § 2285 at 527.

Wigmore's fourth condition is not met when the decision to waive the privilege is nothing more than a matter of timing for strategic advantage at trial. Where a party ultimately intends to waive the privilege at trial, disclosure in advance thereof will cause no injury to the relation between attorney and client and can only benefit the correct disposal of litigation.

In the instant case, the defendant has denied the plaintiff's contentions that the complaint before the Public Service Commission was sham and has further raised two counterclaims relative to those proceedings. It is likely that in defending the main claim and asserting its counterclaims United Telephone Company will choose to introduce testimony and documentary and other evidence which pertain to confidential communications between the defendant and its attorneys, including, but not limited to, the assertion that the proceedings before the Public Service Commission were instituted in good faith and upon advice of counsel.

Fundamental fairness and justice requires that if the defendant intends to waive the privilege at trial by the introduction of evidence within that privilege, then the defendant will be required to allow discovery with regard to matters material to that testimony.

 Since it is not presently possible to ascertain the extent and scope of any waiver of the attorney-client privilege by the parties at trial, it is also not possible at this time to determine what the scope of discovery of such privileged materials will be. However, it should be made clear that the failure of a party to allow pre-trial discovery of confidential matter which that party intends to introduce at trial will preclude the introduction of that evidence. *See*, Rule 37(b)(2)(B), Federal Rules of Civil Procedure.

## VI

### *Work Product*

 While the attorney-client privilege has previously been discussed as being relatively absolute, the so-called "work-product" privilege is not a privilege, but is a qualified immunity from discovery. Kirkland v. Morton Salt Co., 46 F.R.D. 28 (N.D.Ga.1968).

The law relative to the discovery of the attorney's "work product," initially

7. *E. g.*, Garner v. Wolfinbarger, *supra*.

enunciated in Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), has been substantially codified in the 1970 amendment to Rule 26 of the Federal Rules of Civil Procedure. Rule 26(b)(3) provides, in pertinent part:

". . . a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or . . . that other party's representative . . . only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

The items requested by the plaintiff which are subject to the work product privilege are almost absolutely unavailable otherwise. Under those circumstances, the items would ordinarily be discoverable. However, the defendant, in objecting to the plaintiff's interrogatories and requests for documents relies on both the work product and attorney-client privileges. Where both privileges are available, the items would not be discoverable except as previously mentioned.

▮▮▮ The mental impressions and legal theories of the attorney are, of course, entitled to greater protection than other so called "work product materials". Hickman v. Taylor, *supra*; Rule 26(b)(3) Federal Rules of Civil Procedure. Accordingly, the Court finds that at this time the plaintiff has not made a sufficient showing to invade the mental impressions of the attorneys in preparing the case for presentation before the Public Service Commission and that consequently the plaintiff's motion to compel insofar as it applies to interrogatories numbers 12 and 13 and the documents pertinent thereto should be denied.

Accordingly, it is

Ordered:

1. Plaintiff's motion pursuant to Rule 37 to compel answers to interrogatories and production of documents is hereby denied insofar as it pertains to defendant's objections to interrogatories 12 and 13.

2. Ruling upon plaintiff's motion in all other respects is hereby deferred pending an *in camera* examination of the answers to interrogatories and documents which defendant contends to be privileged.

3. Determination of the date of said *in camera* inspection is deferred pending plaintiff's filing within 15 days of the date of this order a motion to compel directed to defendant's objections to discovery on grounds of burden, vagueness and materiality and the Court's ruling upon that motion; in the event the Court should, after hearing, deny said motion to compel as to those grounds the Court will then conduct said *in camera* inspection.

It is so ordered.