**SYNAIR CORPORATION, Plaintiff,**

v.

**AMERICAN INDUSTRIAL TIRE, INC., Defendant.**

**Civ. A. No. H–82–1070.**

United States District Court,
S.D. Texas,
Houston Division.

Aug. 28, 1986.

James Geriak, Los Angeles, Cal., Kenneth E. Kuffner, Arnold, White & Durkee, Houston, Tex., for plaintiff.

Richard L. Schwartz, Steven Rosenblatt, Pravel, Gambrell, Hewitt & Kirk, Houston,

Tex., John K. Roedel, Jr., Senniger, Powers, Leavitt and Roedel, St. Louis, Mo., for defendant.

## ORDER

HITTNER, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(A), United States Magistrate Karen Brown has reviewed Defendant American Industrial Tire, Inc.'s motions to compel disclosure of a number of documents, and has issued an order requiring Plaintiff to produce its privileged document list. Plaintiff has objected to this order and has requested that this Court review the order.

A trial court judge may reconsider a nondispositive order of the magistrate only where it has been shown that the magistrate's order is clearly erroneous or contrary to law. 28 U.S.C.A. § 636(b)(1)(A) (1986). This Court has reviewed the Defendant's motions to compel, Magistrate Brown's order, and the points and authorities filed by the parties and finds that the order is neither clearly erroneous nor contrary to law. Consequently, the order is AFFIRMED.

IT IS ORDERED that the parties comply fully with Magistrate Brown's Order filed in this case on April 3, 1986, a copy of which is attached.

## MAGISTRATE'S ORDER

KAREN K. BROWN, United States Magistrate.

### I.

ON THIS DATE CAME ON TO BE CONSIDERED the motions by defendant American Industrial Tire, Inc., to compel disclosure of a number of documents regarding which plaintiff claims the attorney/client or work product privileges.[1] Following a hearing in this case, the Court ordered plaintiff to submit for *in-camera* inspection all documents requested by defendant about which plaintiff raised either privilege. Thereafter, plaintiff submitted over 2,000 documents. After reviewing this submission, the Court conducted an *ex parte* proceeding with counsel for the plaintiff in order to provide plaintiff with an additional opportunity to present information regarding those documents prior to the Court's ruling. At that time, plaintiff stated that it had no further objection to the release of some documents if the Court were to order them produced. With regard to other documents, plaintiff urged that they not be released. Appendix A, attached hereto, is a list of documents that plaintiff does not now object to producing. Appendix B is a list of documents that the Court has determined do not fall within either privilege. The documents listed in both appendices are identified by plaintiff's numbering system. It is ORDERED that plaintiff shall produce the documents listed in Appendix A and Appendix B to defendant.

### II.

Defendant argues that plaintiff should produce *all* documents sought because Edward Gomberg, plaintiff's president, primary shareholder, and the named inventor of the patent in suit, allegedly committed fraud on the Patent Office when he obtained both the original patent and the reissue patent involved in this case. Defendant recites a number of events which assertedly demonstrate that fraud on the Patent Office (PTO) occurred at the time of the application for the original patent on October 10, 1973. (App. No. 404,856—Letters Patent No. 3,866,651 issued February 15, 1975.)[2] Defendant contends that this fraud continued when Gomberg sought a reissue of his patent on November 14, 1977, even though he included additional information regarding the prior art in that reissue application. (App. No. 3,866,651—Reissue Patent 29,890 issued January 30, 1979.)

---

**1.** A number of other discovery motions were pending at the time of the hearing before this Court but the parties represent that they have resolved these matters by agreement.

**2.** The original file history regarding '651 is missing from the PTO.

Regarding the attorney/client privilege, the Fifth Circuit has stated:

The privilege must be placed in perspective. The beginning point is the fundamental principle that the public has the right to every man's evidence, and exemptions from the general duty to give testimony that one is capable of giving are distinctly exceptional. 8 Wigmore, Evidence, § 2192 at 70. An exception is justified if—and only if—policy requires it be recognized when measured against the fundamental responsibility of every person to give testimony. *Id.*, § 2285 at 527.

*Garner v. Wolfinbarger*, 430 F.2d 1093, 1100 (5th Cir.1970). Where communications between attorney and client are at issue the question to be decided is whether:

The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

Wigmore, Evidence § 2285 at 527–28. The privilege:

... ought to be strictly confined within the narrowest possible limits, consistent with the logic of its principle.

*Id.*, § 2291 at 554.

Plaintiff asserts both the attorney/client and work-product privileges and therefore must establish their applicability. *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Rohm and Haas Co. v. Dawson Chemical Co., Inc.*, 214 U.S.P.Q. 56, 58 (S.D.Tex.1981). The traditional prerequisites for assertion of the attorney/client privilege are:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law of (ii) legal services or (iii) assistance in some legal proceeding, and not for the purpose of committing a crime or tort; and (4) the privilege has been claimed and not waived by the client. *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59, 85 U.S.P.Q. 5, 6 (D.Mass.1950); *In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir.1975).

Defendant urges that in the patent context, the duty of candor owed by the patent applicant to the PTO further limits the scope of the attorney/client privilege. Under this "conduit theory", defendant argues that no privilege attaches to information available to the patent applicant regarding prior published art, prior public uses or sales, or technical information relating to the invention, so long as such information is material to the examination of the pending patent application. *Jack Winter, Inc. v. Koratron Co.*, 50 F.R.D. 225 (N.D.Cal.1970); *American Cyanamid Co. v. Hercules Powder Co.*, 211 F.Supp. 85 (D.Del.1962); *Zenith Radio Corp. of America v. Radio Corp. of America*, 121 F.Supp. 792, 794 (D.Del.1954).

Plaintiff responds that other courts have not followed the rationale of *Zenith* and *American Cyanamid* in interpreting the scope of the privilege when applied to patent attornies and patent agents. *See Sperry v. Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963); *Natta v. Hogan*, 392 F.2d 686 (10th Cir.1968). Moreover, according to plaintiff, the true meaning of *Jack Winter* is that the privilege does not apply to technical material that was meant to be turned over to the PTO in the first place. Such information was never disclosed in confidence. *See Hercules, Inc. v. Exxon Corp.*, 434 F.Supp. 136, 147 (D.Del. 1977).

■ The "duty of candor and good faith" is owed by the applicant, attorney or patent agent, and all others substantially involved in the patent application process. 37 C.F.R. § 1.56(a) (1985). All such persons must disclose all material information

**1084**

known to them. *Id.* Consequently, material information falls outside the attorney/client privilege for this reason.

■ Like the attorney/client privilege, the work product privilege is applicable to patent cases as well. *Burlington, Ind. v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1974). Absent special circumstances, an attorney is assured that his private files are protected from discovery by adversaries. Documents prepared in anticipation of litigation and constituting an attorney's "work product" are not generally discoverable without a showing of unusual hardship and need. *Hickman v. Taylor, supra;* Rule 26(b)(3), Fed.R.Civ.P.

■ Communications between attorney and client made in furtherance of a crime or fraud are not protected by either the attorney/client privilege or the work product immunity. *Clark v. United States,* 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933); *Rohm and Haas Co. v. Dawson Chemical Co., supra* at 58. Defendant bears the burden to show both a prima facie case of fraud, *Clark v. United States,* 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), and that the communications were made in furtherance of the fraud. *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136 (D.Del.1977).

■ A mere charge of illegality will not dispense with the privilege. *Clark v. United States, supra* at 14, 53 S.Ct. at 469; *International Telephone & Telegraph Corp. v. United Telephone Co.,* 60 F.R.D. 177, 181 (M.D.Fla.1973). This Circuit has avoided the term "prima facie" and labeled the burden of the party seeking production as one to introduce evidence giving "color to the charge." *Pollock v. United States,* 202 F.2d 281 (5th Cir.1953). More recently, the Fifth Circuit has listed a number of factors to be balanced in determining whether "good cause" exists. *Garner v. Wolfinbarger, supra* at 1103 (shareholder derivative suit).

■ In addition, communications made after the commission of the alleged fraud is complete, remain protected by the applicable privilege "since one of the primary purposes of the attorney/client privilege is to allow consultation in the interest of establishing a legal defense." *Hercules, Inc. v. Exxon Corp., supra* at 155; *George v. Le-Blanc,* 78 F.R.D. 281 (N.D.Tex.1977); *W.R. Grace and Co. v. P. Ballantine & S., Inc.,* 175 U.S.P.Q. 464 (D.N.J.1970).

Defendant contends that the leading case of *American Hoist and Derrick Co. v. Sowa and Sons, Inc.,* 725 F.2d 1350 (Fed. Cir.1984) (*AmHoist*) sets the standard for measuring allegations of fraud in patent cases. In *AmHoist* plaintiff sued for infringement of its patent for a heavy duty shackle. Defendant counterclaimed for a declaratory judgment of invalidity. In *AmHoist,* as in the case at bar, the patentee filed a reissue application with the Patent and Trade Office [PTO] and, after amending its statements regarding prior art, was granted a reissue patent. The Federal Circuit reversed and remanded on several issues, including the failure of the jury instructions to properly place the burden to prove invalidity on the attacker of the patent and to properly instruct regarding the presumption of correctness attached to the actions of the PTO in granting a patent where it has been newly informed of the existence of relevant prior art in the application for a reissue patent. Regarding the trial on the merits of the applicant's duty of disclosure to the PTO, the Federal Circuit concluded that a balancing test was appropriate and directed the District Court to assess the question of fraud by balancing evidence of intent with evidence of materiality, strong evidence on either issue tending to create a probative inference on the other. Following PTO Rule 1.56(a), the *AmHoist* court defined materiality as existing "where there is [1] a substantial likelihood that [2] a reasonable examiner [3] would consider it important [4] in deciding whether to allow the application to issue as a patent." *American Hoist and Derrick Co. v. Sowa and Sons, Inc., supra* at 1362, quoting 37 CFR 1.56(a) (1983).

Defendant argues that the *AmHoist* fraud standard has replaced the traditional elements of common-law fraud and thereby

lessened the burden imposed on one seeking to pierce the attorney/client privilege. Based on *AmHoist*, defendant contends that the applicant's duty of disclosure of material facts to the PTO sets the standard for evaluating allegations of either fraud or inequitable conduct.

■ Inequitable conduct as defined by the Federal Circuit is broader than "common law fraud". *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984). That Court prefers the phrase "Inequitable conduct" to "fraud" because the latter is subject to confusion with other forms of conduct. *Id.* Inequitable conduct requires proof by clear and convincing evidence and encompasses "affirmative acts of commission, *e.g.*, submission of false information, as well as omission, *e.g.*, failure to disclose material information." *Id.*

By contrast, plaintiff suggests that this Court apply the test used by the Court of Claims in *American Optical Corp. v. United States*, 179 U.S.P.Q. 682 (Ct.Cl.1973). In *American Optical*, the Court held that the privilege "when challenged by misrepresentation or omission before the Patent Office, should be pierced when, and *only when, a prima facie case of fraud* has been shown." (emphasis added)

■ Recognizing the general rule that a patent may well be declared unenforceable, as opposed to invalid, where there exists inequitable conduct in the form of misrepresentation and/or omission before the PTO even though there is no proof of outright fraud, the *American Optical* Court specifically required proof of actual fraudulent procurement, including a showing of:

... (1) a knowing, willful and intentional act of misrepresentation or omission before the Patent Office; (2) the misrepresentation or omission must be material;

and (3) the Patent Office must have relied upon the representation or omission. *Id.* at 684.

In *American Optical* the Court of Claims specifically found that fraudulent intent could be presumed where there occurred a knowing misrepresentation of a material fact before the Patent Office. One alleging fraud on the Patent Office was required to show that the missing reference related to the subject matter of the claims and that "but for" the omission or misrepresentation the examiner would have disallowed the claims.[3] *Id.*

■ Following the law of the Court of Appeals for the Federal Circuit as this Court must, it is clear that there is no difference in the test to be applied in a case of inequitable conduct versus a case of common law fraud. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984). The duty of candor owed by applicant and attorney is not limited to the avoidance of common law fraud. In a case alleging either inequitable conduct or fraud, the question presented is whether there exists a prima facie showing that the withheld information was material as that term is defined in PTO Rule 1.56(a), *i.e.* whether there is a substantial likelihood that a reasonable examiner would have considered the omitted information *important* in deciding whether to allow the application to issue as a patent. *Id.* at 1559.

■ The materiality of the disclosure and the intent of the actor must be measured by this Court. Simple oversight or mistake is not sufficient. *Orthopedic Equip. Co. v. All Orthopedic Appliances*, 707 F.2d 1376 (Fed.Cir.1983). It may be shown by "acts the natural consequences of which are presumably intended by the actor". *American Hoist & Derrick Co. v.*

---

3. The "but for" test presents a paradox. While examiners have testified in some cases, in most instances the PTO will assert a governmental privilege to bar the examiner from testifying about his mental impressions and, in particular, to prevent his speculation about the possible impact of omitted prior art on his prior decision to allow the claims. *In re Mayewsky*, 162 U.S.

P.Q. 86 (E.D.Va.1969); *Shaffer Tool Works v. Joy Manufacturing Co.*, 352 F.Supp. 824 (S.D.Tex. 1972); *Manual of Patent Examining Procedure* § 1701 & § 1701.01. Consequently, the test requirements cannot usually be met directly by the litigants using the examiner's own testimony.

*Sowa & Sons, Inc., supra* at 1363. Gross negligence may be sufficient as well. *Driscoll v. Cebalo,* 731 F.2d 878, 884 (Fed. Cir.1984).

In sum, there are two questions to be answered by the Court:

1) Has defendant presented sufficient evidence to show good cause to believe that plaintiff violated its obligations of candor to the PTO by failing to disclose prior sales or material prior art?

2) If so, what is the scope of permissible disclosure in view of plaintiff's assertion of the attorney/client and work product privileges?

## III.

### DEFENDANT'S POSITION

Defendant argues that the evidence shows both prior invention and prior sale and use about which Gomberg knew or should have known which was not disclosed to the PTO. Specifically, defendant urges that evidence shows that prior to the original patent application there was a wheelbarrow tire filled in 1966 with a urethane composition which was intended to be void-free (Cooke Wheelbarrow) and that principals of Indpol (the Synair predecessor corporation) sold two-component tires which were intended to be void-free to Kaiser Steel in 1968 just prior to the formation of Indpol. Defendant urges that in both instances these were tires previously filled with the same or very similar composite materials which were intended to be void-free. Since the essence of Gomberg's invention (in the original patent, the tire itself and later in the reissue patent, the technique for filling the tire) was intended to be void-free, defendant reasons that both the Cooke Wheelbarrow and the Kaiser Steel tires were relevant prior art. It was specifically the void-free character of these tires which was withheld from the PTO either with actual intent or with reckless disregard for the truth by Gomberg, according to defendant.

In 1966, Carol Cooke and Art Deliman filled the Cooke Wheelbarrow tire. Both men were employed by or involved with Indpol while the Kaiser tires were being filled as well. Later the same men were actively involved with Gomberg in 1972 when he began developing his tire fill system. (Cooke was in fact later listed as a co-inventor of the patent in suit.) Defendant urges that Gomberg, who worked daily with Cooke and Deliman, knew or should have known about their prior tire filling projects on behalf of Indpol.

Moreover, defendant points out that Gomberg, himself, applied for a trademark application for the term "Tyrfil" on September 18, 1972, over one year prior to the date of the original patent application on October 10, 1973. This trademark application recites a date of first use of May 15, 1972 and a date of first use in commerce of August 23, 1972. (Exhibit 2) Even accepting Gomberg's contention that the August date shows a sale to a Canadian corporation (which would prevent this sale from constituting a use in commerce so as to disqualify the original patent application before the Patent Office), defendant argues that the May sale must necessarily have been an intrastate sale which *would* have the effect of disqualifying the application from patent eligibility, had Gomberg disclosed it to the PTO. *See generally,* 35 U.S.C. § 102(b); *Strong v. General Electric Co.,* 434 F.2d 1042 (5th Cir.1970); *cf., Southern Implement Mfg. Co. v. McLemore,* 350 F.2d 244 (5th Cir.1965).

In addition, defendant contends that Gomberg hired a Dr. Phillipson to develop formulations which included tire-filling materials. Although Dr. Phillipson did not consider himself an inventor, defendant urges that the formulations he produced were as broadly applicable as were the features of the patent claims submitted by Gomberg to the Patent Office in the original application. Defendant also relies on the deposition of witness Gilmore, who stated that, after Gomberg replaced Wyman at Indpol, Gomberg found an invoice on a tire-filling material and was overheard to say "that's the product for me". De-

fendant suggests that based on Gilmore's testimony such an invoice existed and has now disappeared.

Defendant maintains that Gomberg failed to disclose even in the 1977 reissue application that the prior art, the Cooke Wheelbarrow and the Kaiser tires, was intended to be void-free. Defendant contends that this information was actually known to Gomberg or was so readily available as to show his reckless disregard for his duty to disclose.

Defendant points to two advertisements published in trade magazines prior to the filing of the original patent application. (Exhibits 1 and 1A) Defendant asserts that both ads were based on Indpol news releases and show the availability in commerce of Tyrfil material more than one year before Gomberg applied for the original patent.

## IV.

### PLAINTIFF'S POSITION

Plaintiff answers defendant's allegations point for point. Plaintiff argues that there is fundamentally no evidence produced by defendant to show Gomberg's knowledge of any of these tire filling projects prior to the application and issuance of the original patent. Gomberg was not connected with Indpol at the time that these previous tires were filled. There is no evidence that he ever saw the Cooke Wheelbarrow tire and no evidence that he was ever told about the Kaiser tires prior to the original patent application.

Plaintiff urges that Gomberg complied with his duty of disclosure to the PTO. That duty, according to plaintiff, is to state all pertinent prior art known to the applicant. That duty is not to search for all possible prior relevant art. *American Hoist and Derrick Co. v. Sowa and Sons, Inc., supra* at 1362.

Plaintiff contends that, even assuming Gomberg did know something of the previous tires, there is no evidence that either this prior art *was* material or that Gomberg *knew* the prior art was material. Specifi-

cally, plaintiff maintains that the PTO has validated plaintiff's position because Gomberg specifically disclosed the Cooke Wheelbarrow and the Kaiser tires to the PTO in 1977 when he applied for the reissue patent (No. 29,890) which was issued on January 30, 1979. After those declarations, the PTO authorized the reissue patent and it would not have done so had it determined that that prior omitted art was material. Moreover, plaintiff urges that there is no concrete evidence of the void-free nature of the Cooke and Kaiser tires. The participants themselves, Wyman, Gilmore and Cooke, cannot clearly agree as to the nature and composition of the tire fill materials.

Moreover, plaintiff maintains that there is no evidence that Gomberg ever knew that this prior art was material. Even if the participants had specifically told him prior to the original patent application that these tires were intended to be and were in fact void-free, none of the participants except Wyman (who was gone within three weeks of Gomberg's arrival at Indpol) had the technical expertise to accurately assess the void-free character of such tires. Consequently, plaintiff argues that, even if someone had told Gomberg that this prior art was material because the tires were intended to be void-free, Gomberg personally would not have credited their assessment of the nature of the tires because of their lack of expertise.

Plaintiff urges that the May 1972 date contained in the Tyrfil trademark application was a mistaken reference. The first date of use should have only been listed as August 1972, the date of the interstate sale to Canada. In addition, plaintiff maintains that there is no clear evidence regarding the advertisements at issue. The ads themselves do not carry dates of usage and there is no showing that the material was in use as of that date or that Gomberg knew personally about any use.

## V.

### CONCLUSIONS

█ Individually, the facts presented by defendant are not sufficient to carry

defendant's burden. However, cumulatively, these facts present a very close question. After reviewing the depositions, documents, and cases cited by both parties, this Court concludes that defendant has presented clear evidence that the patented tire and tire filling process may well have been in use more than one year prior to the date of filing for the original patent and there may well have been material prior art known to the patent applicant which was not disclosed to the PTO.

The determination by the PTO is due deference by this Court. 35 U.S.C. § 282; *South Corp. v. United States*, 690 F.2d 1368 (Fed.Cir.1982). But here, unlike the *AmHoist* case, defendant has offered significant information which was not given to the PTO by the applicant prior to the issuance of the original patent or prior to the issuance of the reissue patent. Moreover, it is unclear whether any one patent examiner ever had the opportunity to evaluate all the information that was submitted by the applicant in view of the missing file history of the original patent and the piecemeal manner in which the information was disclosed to the PTO.[4]

Attached to this opinion are two articles on which defendant relies. (Exhibit 1 and 1A) * Plaintiff applied for the original patent on October 10, 1973. Trade journal employees testified that the information in these articles was derived from plaintiff's own news releases. These articles indicate that the Tyrfil material and process was available to the public prior to one year before the date of the original patent application of October 10, 1973.

Soon after the original patent application was filed, plaintiff filed with the PTO a Notice of Experimental Use (Exhibit 6) in order to notify the PTO of Tyrfil's introduction to the commercial market on October 8, 1972 at a U.S. Department of Commerce sponsored exhibit in Milan, Italy. The cover letter by Attorney Gausewitz points out to the Commissioner of Patents that the Milan show does not count as a statutory bar in part because "it was not in this country." (Exhibit 3) However, Gausewitz fails to mention that Tyrfil was offered for sale by Indpol in this country at or prior to the same date as shown by Exhibits 1 and 1A. Nor do these letters mention or attempt to explain the May 12, 1972 date of first use listed in the Tyrfil trademark application. (Exhibit 2)

Moreover, this Court cannot disregard this Indpol trademark application for "Tyrfil" which recites as its first date of use, May 12, 1972. Plaintiff argues that this simply must have been a mistake and that Indpol really intended the date expressed in the application to show a first use date of August 23, 1972, the date of the sale to the Maine Rubber Company in Canada. However, the trademark application itself recites *two* distinct dates, May 12, 1972 and August 23, 1972. Applicants for trademarks have a duty of candor to the PTO as well. This Court is reluctant to disregard two such clearly expressed and distinctively recited dates such as those shown on the trademark application.[5] (Exhibit 2)

Moreover, the May 12, 1972, date is a plausible date for the first use because both Phillipson and Gomberg had been actively involved in the formulation of two component polyurethane tire fill compounds in early 1972. Specifically, Gomberg recited tire filling experiments in which he, Cooke, and Deliman participated in March and April of 1972. (Exhibit 6) It is possible that there was Tyrfil material available in use by May 1972. Gomberg, as the major officer of Indpol at the time,

---

4. Plaintiff applied for the reissue patent in 1977 and filed the Declaration adding non-joined inventor (Cooke) (Exhibit 4) in January 1980. The PTO never acted on this Declaration because of the Arnco litigation pending at the time.

* *Ed. Note*: The exhibits have been omitted for purposes of publication.

5. The Court would note that there was a shipment of a tire filled with polyurethane material from Indpol to Spadel Tire and Wheel Co. in Englewood, Colorado in May 1972, for what has been sworn by the President of Spadel to be an experimental use. (See R. 38, Exhibit C.)

could not have been unaware of such commercial activity.

In addition, there appears to be considerable merit to defendant's arguments that the Cooke and Kaiser tires constituted material prior art which was known or should have been known to Gomberg and disclosed to the PTO. Although Gomberg testified that he was unaware of the Cooke Wheelbarrow tire or the Kaiser tires prior to his original patent application, it strains credibility to believe that working daily with Deliman and Cooke in early 1972 on tire filling projects, neither man ever mentioned to Gomberg that they had previously participated in very similar if not identical projects on behalf of Indpol. In addition, during this time, Cooke and Gomberg specifically filled a forklift wheel in the Cooke Machine Shop next door to Indpol with the Gomberg formulations. It is unlikely that Cooke would not have told Gomberg that he still had the original wheelbarrow in use in the same shop at the time.[6]

In the original application in 1973, Gomberg claimed to be the sole inventor with no mention of the prior art. Then in "The Declaration of Edward N. Gomberg in Support of Reissue Patent", filed on November 10, 1977 he stated:

6. *Since the grant of my original patent,* I have learned that one Carol Cooke, one of the founders in 1965 of Indpol and a present member of its Board of Directors, was asked in 1968 by a Mr. Claude Swearingen, an employee of Kaiser Steel Corporation of Fontana, California, to devise a solution for eliminating the problem of flat tires on Kaiser equipment. Apparently Cooke had suggested to Swearingen that Indpol could do this based upon an experiment he had conducted in 1965. In that experiment, Cooke had asked one Albert Deliman to fill a wheelbarrow tire with a two component urethane resin system manufactured by Churchill Chemical Corp. which

was designed to be used for making squeegee rolls. (emphasis added)
Exhibit 5, p. 3.

Later in 1980, Gomberg filed with the PTO an instrument entitled, "Declaration of Edward N. Gomberg in support of Certificate adding non-joined Inventor" (Exhibit 6) in which he recites that:

3. When I joined Indpol Corporation in mid–1971 the company was in the business of manufacturing urethane systems unconnected with tires and filling composition for tires. *Based on discussions with Cooke, I was generally aware of Cooke's involvement with a* polyurethane filled tire and the development of a filled tire with which he had experimented previously and problems encountered in introducing the filler into the tires. I understood that the project had at that stage been abandoned by Indpol. (emphasis added)

. . . . .

5. During the development of the composition and product I exchanged views and information with Cooke who assisted in reviewing test results with various compositions which I was formulating and offered suggestions for tire filling procedures. The testing included evaluating tires filled in 1972, with a polyurethane composition which I developed, and placed on a forklift used in Cooke's machine shop.
Exhibit 6, p. 2.

Moreover, it is evident from the record that Gomberg was actively involved in the attempts in 1972 to salvage Indpol. Gomberg was in charge of all office records and the Kaiser tire invoices were available which indicated the transaction with Aerol and Kaiser. Lastly, the Cooke wheelbarrow tire was in daily operation in Carol Cooke's machine shop which was located next door to Indpol. These are small, con-

---

**6.** There is disputed testimony about how open and obvious the inside content of the wheelbarrow tire was during this time to someone who was not otherwise aware of the nature of the tire. The outer casing is said to have worn away so that only the hardened inside material was apparent. But other testimony suggests that metal shavings adhered to the inner tire material and obscured a clear view of the nature of the inside material.

tiguous businesses which appear to have had regularly overlapping activities.

Two problems attend defendant's argument that the Cooke and Kaiser tires constituted pertinent prior art known to Gomberg which should have been disclosed to the PTO in the first instance. The first problem is that ultimately, once Synair and Arnco began litigation and some of the legal weaknesses of the patent were made apparent to Gomberg, a reissue patent application was sought by Indpol. A general statement of the existence of the Cooke tire and the Kaiser tires were included in this reissue application. This application is a carefully drafted legal instrument, designed to inform a patent examiner of the existence of those two prior tire fill projects and to leave the impression that Gomberg never knew and could not have discovered their existence prior to the original patent application on October 10, 1973.[7] Specifically, the recital emphasizes that Kaiser has a policy of destroying records and, consequently, there was no way for Gomberg to determine the substance of the Kaiser tests. The reissue application leaves the impression that information about these projections was unknowable by Gomberg in 1972. The active, ongoing work relationship between Gomberg, Deliman and Cooke in 1972 is omitted and there is no mention of Gilmore and Wyman, who were participants in the Kaiser tires projects, because at the time of the reissue application, Gomberg was in litigation with Wyman. Neither Cooke nor Deliman was mentioned in this reissue application as an available source of information about the previous tire filling projects. Plaintiff argues that neither man was qualified to state an opinion on the nature of these prior endeavors. Significantly, however, plaintiff named Cooke as co-inventor after issuance of the reissue patent and apparently should have named Cooke as co-inventor in connection with the original patent. (Exhibit 6)

The second problem presented by defendant's argument is that Wyman ultimately settled the Arnco suit with Indpol. Defendant alleges that Wyman was at least a likely inventor of the original compound and procedure for tire filling used in the Cooke and Kaiser tires. For Arnco to settle this prior litigation with Synair arguably indicates that Arnco anticipated losing the patent validity issue. However, as defendant suggests, there are many reasons to settle patent suits, including the high costs involved in such litigation. Moreover, at the time of settlement, Arnco obtained from Synair a specific license as part of that settlement. Arnco's agreement not to bring further suit to invalidate the patent clearly protects that license. Had Arnco been successful in the invalidation of the patent, it would have opened up a lucrative field for all possible infringers.

Moreover, the Court cannot ignore the declaration of Edward N. Gomberg in support of a certificate adding a non-joined inventor (Cooke) written to the commissioner of the PTO explaining that Cooke was in fact a co-inventor of the patent in suit. (Exhibit 6) In this declaration, which is another crafted document, Gomberg offers several reasons why Cooke's inventorship of the patent in suit was omitted. In any case, Gomberg has previously claimed before the patent office in the reissue application and in the original application that he himself was the sole inventor. These two omissions, plus the allegedly mistaken date of May 12, 1972, contained in the Tyrfil trademark application, are successive instances of significant and inaccurate statements in documents submitted to the PTO by Gomberg. Although plaintiff offers explanations for these omissions, such repeated instances lead the Court to find that defendant has sustained its burden to show prima facie evidence that plaintiff breached its obligation of candor in both the original application and the re-issue application.

7. Defects in patents may be corrected through reissue proceedings brought before the PTO only if the defects arose "through error and without any deceptive intent ..."

35 U.S.C. § 252 *et seq.*

The question remaining for the Court is the impact of this decision. The Court has concluded that further briefs from the parties are appropriate. Accordingly,

1) Plaintiff is hereby ORDERED to produce its privileged document list to defendants within ten (10) days of this date. This list previously accompanied the documents submitted to the Court. Plaintiff may delete references to any previously undisclosed expert witnesses contained in this list.

2) Defendant shall file within twenty (20) days thereafter a brief directed to the following points:

a) What documents by category and number should be produced based on the Court's findings in this Order?

b) Whether the Court's findings of adequate proof of inequitable conduct before the PTO necessarily requires disclosure of documents otherwise protected by the work-product privilege but which were generated during subsequent litigation to enforce the patent at issue?

3) Plaintiff shall have twenty (20) days thereafter to file its response.

DATES

1966   Cooke Wheelbarrow tire filled
Indpol Corp. formed—Ransome Wyman, Pres.
Other Principals—Carol Cooke
             Oscar Gilmore
             Arthur Deliman
             Price

1968   First Kaiser tires filled at Indpol (Wyman, Cooke, Deliman)

1969   More Kaiser tires filled using Aerol pumps and Indpol two component elastomer at behest of Indpol

1971   Gomberg hired 6/1/71 (and becomes President later)
Wyman fired 6/29/71 as President Cooke, Deliman and Gilmore remain with Indpol

1972   Phillipson employed by Gomberg 2–3 months only, Jan. thru March. Works on two component polyurethane, tirefill compounds intended to be essentially void-free.

March–April—Gomberg, Cooke and Deliman tirefill experiments—tested by Spadel in May 1972

May 12, 1972—Trademark Application for "Tyrfil" recites as first date of "use"

August 23, 1972—Trademark Application for "Tyrfil" recites as date of "first use in commerce" [Canada. (Maine Rubber Co.)]

DATES

September 18, 1972—Trademark Application filed for "Tyrfil"

October 9, 1972—Publication, Rubber & Plastics News. "Indpol develops tire-filling system for off-road casings" testimony—publisher generally received information two weeks before. (Exhibit 1)

October, 1972—Tire Review Article on Tyrfil—testimony uncertain as to exact date—generally mailed first week of month. (Exhibit 1A)

1973

October 10, 1973—Original Patent Application filed (No. 404,856) (missing)

1975

February 18, 1975—Letters Patent issued No. 3,866,651 ('651)

1976

December 7, 1976—"Tyrfil" trademark registration issued to Indpol (Exhibit 2)

1977

November 14, 1977—Reissue application filed, reciting changes in references, informing PTO of Cooke Wheelbarrow and Kaiser tires and claiming that Gomberg was sole inventor of "flat-free pneumatic tire and void-free filling therefor" (Exhibit 5)

1979

January, 1979—Reissue Patent (No. 29,890)

1980

January 8, 1980—Declaration of Edward N. Gomberg in support of certificate adding non-joined inventor (Cooke) written to Commissioner of PTO explaining that Cooke was really co-inventor (Exhibit 6)

1981   Arnco suit settle—1 million dollars paid to Synair

APPENDIX A

| | | |
|---|---|---|
| 297 | 10008 | 10034 |
| 408 | 10009 | 10035 |
| 450 | 10010 | 10036 |
| 630 | 10011 | 10037 |
| 839 | 10012 | 10039 |
| 1002 | 10014 | 10040 |
| 1359 | 10015 | 10041 |
| 1362 | 10016 | 10042 |
| 1364 | 10017 | 10043 |
| 1442 | 10018 | 10052 |
| 1445 | 10019 | 10053 |
| 1564 "with Redaction" | 10020 | 10054 |
| 1697 | 10021 | 10055 |
| 1698 | 10025 | 10056 |
| 1704 | 10026 | 10058 |
| 10001 | 10027 | 10059 |
| 10004 | 10028 | 10061 |
| 10005 | 10029 | 10062 |
| 10006 | 10030 | 10091 |
| 10007 | 10033 | 10092 |
| 10095 | 10140 | 10447 |
| 10096 | 10141 | 10450 |
| 10097 | 10142 | 10459 |
| 10098 | 10143 | 10465 |
| 10104 | 10144 | 10520 |

| | | | |
|---|---|---|---|
| 10106 | 10148 | 10529 | 10839 |
| 10109 | 10149 | 10532 | 10840 |
| 10110 | 10151 | 10535 | 10841 |
| 10112 | 10152 | 10666 | 10842 |
| 10113 | 10153 | 10669 | 10843 |
| 10114 | 10179 | 10672 | 10844 |
| 10121 | 10205 | 10717 | 10845 |
| 10122 | 10206 | 10737 | 10846 |
| 10126 | 10209 | 10740 | 10847 |
| 10127 | 10234 | 10754 | 10848 |
| 10128 | 10235 | 10757 | 10849 |
| 10129 | 10239 | 10758 | 10850 |
| 10130 | 10289 | 10764 | 10851 |
| 10131 | 10290 | 10766 | 11527 |
| 10137 | 10295 | 10792 | 11510 |
| 10138 | 10297 | 10803 | 11445 |
| 10139 | 10325 | 10853 | |
| 10856 | 11112 | 11189 | |
| 10860 | 11113 | 11195 | |
| 10986 | 11116 | 11197 | |
| 10989 | 11117 | 11199 | |
| 10996 | 11118 | 11208 | |
| 11016 | 11123 | 11209 | |
| 11024 | 11124 | 11211 | |
| 11046 | 11126 | 11215 | |
| 11055 | 11133 | 11217 | |
| 11061 | 11137 | 11219 | |
| 11064 | 11148 | 11224 | |
| 11067 | 11156 | 11225 | |
| 11070 | 11158 | 11226 | |
| 11077 | 11161 | 11227 | |
| 11078 | 11170 | 11228 | |
| 11079 | 11173 | 11229 | |
| 11088 | 11177 | 11230 | |
| 11091 | 11180 | 11232 | |
| 11092 | 11182 | 11233 | |
| 11107 | 11185 | 11234 | |
| 11108 | 11186 | 11238 | |
| 11109 | 11188 | 11239 | |
| 11243 | 11536 | | |
| 11245 | 11537 | | |
| 11251 | 11539 | | |
| 11254 | 11541 | | |
| 11267 | 11564 | | |
| 11289 | 11566 | | |
| 11290 | 11653 | | |
| 11292 | 11697 | | |
| 11328 | 11698 | | |
| 11342 | 11699 | | |
| 11359 | 11700 | | |
| 11360 | 11701 | | |
| 11362 | 11702 | | |
| 11364 | 11703 | | |
| 11442 | 11704 | | |
| 11443 | 11705 | | |
| 11466 | 11672 | | |
| 11531 | | | |
| 11516 | | | |
| 11519 | | | |
| 11520 | | | |
| 11535 | | | |